# E. I. DU PONT DE NEMOURS & CO. v. BARIDON.
## No. 9955.

Circuit Court of Appeals, Eighth Circuit.
Oct. 12, 1934.

Willis J. O'Brien and John N. Hughes, both of Des Moines, Iowa (Hughes, O'Brien & Faville, of Des Moines, Iowa, and C. M. Spargo, of Wilmington, Del., on the brief), for appellant.

Charles E. Rendlen, of Hannibal, Mo., and Russell E. Ostrus, of Des Moines, Iowa (Rendlen, White & Rendlen, of Hannibal, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

The Du Pont Company in the year 1928 was manufacturing and marketing a patented product known as "Semesan," a poisonous compound with a mercury base, and so labeled, which it advertised as a seed disinfectant or fungicide. The company recommended its use for the treatment of seeds, roots, and bulbs before planting, and represented it as a safe and beneficial plant disinfectant, and, by labels on the containers and by pamphlets furnished to customers through dealers, directed how it should be used. P. C. Baridon was a grower of, and dealer in, gladiolus bulbs, bulblets, and flowers. The bulbs and bulblets of the gladiolus are usually treated before planting with a fungicide or disinfectant to eradicate certain diseases to which they are subject. Mr. Baridon had heard a Du Pont salesman recommend "Semesan" for the treatment of gladiolus bulbs and bulblets before planting, and he was familiar with the defendant's sales literature advocating such use. He had used Semesan in 1927 in a weaker solution than was recommended by the company, apparently without serious injury to the bulbs and bulblets treated. In 1928 he treated some twelve million of his bulblets and a large number of his bulbs with this product, which he procured from a dealer in Des Moines, who in turn had bought it from the Du Pont Company. He procured from this same dealer pamphlets issued by the company which gave directions as to the strength of the solution to be used and the length of time the bulbs and bulblets should be immersed in order to secure the best results. The evidence shows that, so far as the strength of the solution and the period of immersion

were concerned, Baridon in the treatment of his bulbs and bulblets was well within the teachings contained in the directions. He placed the bulbs and bulblets in sacks and dipped them into tanks containing the solution, leaving them there for less than the prescribed time. After removing them from the solution, he dried the bulbs, but did not either dry or immediately plant the bulblets. The sacks were drained, but the bulblets were left in the damp sacks, which were placed in barrels and shipped from Des Moines, Iowa, where they were treated, to Hampton, Iowa, where they were to be planted. They remained in the barrels for at least one week, and possibly two, before being put in the ground. Apparently all of that time they were damp with Semesan solution. Baridon explains this procedure subsequent to treatment by saying that it was customary for growers to keep the bulblets, which have a hard shell, damp for some considerable time before planting them, to soften the shell, and that the directions issued by the Du Pont Company did not prescribe a different treatment. After planting, the bulbs grew, but the bulblets did not. They were virtually destroyed by something, because bulblets from the same bins which were not treated with Semesan grew normally. Baridon attributed the failure of the treated bulblets to grow to the negligence of the Du Pont Company in failing to give proper directions for their treatment. In other words, he says that treating his bulblets with Semesan as directed by the Du Pont Company killed them, and that the Du Pont Company knew or should have known that such treatment would be likely to kill them. The company, on the other hand, attributed the destruction of Baridon's bulblets to his failure to dry them or to plant them immediately after they were treated, and to their being left damp and packed in wet sacks in barrels without necessary ventilation.

Baridon brought suit, alleging the representations made by the Du Pont Company as to the suitability and safety of its product for disinfecting gladiolus bulbs and bulblets, its giving of directions for the use of Semesan, his reliance upon the representations and directions given, the harmful character of the Semesan when used as directed, which the Du Pont Company knew or should have known, and the loss of his bulbs and bulblets and his consequent damage.

The Du Pont Company admitted making the Semesan, but denied that it was harmful when used as recommended; and alleged that there was no privity of contract between

plaintiff and defendant; that it had printed upon the labels on the Semesan containers a nonwarranty of results; and that if the plaintiff suffered any loss, it was due to his own neglect and came from causes other than the treatment of the bulbs and bulblets with Semesan according to directions.

In addition to what has already been stated, the plaintiff's evidence tended to show that a Mr. Bailey, a nursery man of Minnesota, had treated his evergreen seedlings with Semesan as directed by the Du Pont Company, and that such seedlings had been damaged and destroyed; that the Du Pont Company had been notified by Mr. Bailey of his difficulties with its product; that several other gladiolus growers had used Semesan as directed, to their injury, although when used in a weaker solution than that prescribed it had proved either harmless or beneficial.

The defendant's evidence tended to show that Semesan, when used as directed, was beneficial; that gladiolus growers and others had used it with satisfactory results; that Mr. Bailey's trouble was in failure to follow directions, and that the plaintiff's trouble was due to his failure properly to care for his bulblets after they were treated.

The court charged the jury, in effect, that if they found from the evidence that the plaintiff had strictly followed the directions of the Du Pont Company in the treatment of his bulblets, and that his bulblets were destroyed solely because Semesan, when used in accordance with the directions of the Du Pont Company, was a harmful and dangerous product, the plaintiff was entitled to recover. The jury returned a verdict for $7,500 in favor of the plaintiff, and the defendant has appealed from the judgment.

The defendant challenges the correctness of the court's charge and the sufficiency of the evidence to support the verdict. It contends:

(1) That the fact that the product was patented and sold as a patented product relieves the defendant from any responsibility for any negligence with respect to the directions for its use.

(2) That the nonwarranty of results clause printed on the label attached to the containers constituted a complete defense.

(3) That the defendant did not owe to the plaintiff any duty, for the reason that he did not purchase the Semesan from it, but purchased it from a dealer, and hence there was no privity of contract between the plaintiff and the defendant.

(4) That there was no substantial evidence of negligence on the part of the defendant.

The first two contentions, we think, merit little discussion. If the defendant owed the plaintiff the duty to use reasonable care with respect to the giving of proper directions for the use of Semesan, and was liable for a breach of that duty, it would seem to be utterly immaterial whether the product was a patented or an unpatented one.

The nonwarranty of results printed on the label reads as follows: "The use of Semesan being beyond the control of the manufacturer, no guarantee, expressed or implied, is made as to the effects of such use, whether or not in accordance with these directions or claimed so to be." Clearly the most that could be claimed is that the clause notified the plaintiff that if his use of Semesan did not produce the effects which the defendant had represented that it would produce, there would be no cause of action for a breach of warranty. There was nothing about the clause to place him on notice that in using Semesan in accordance with directions he was acting at his own peril, and that if it destroyed his crop, no action for negligence would lie.

The defendant seeks to invoke the general rule that a manufacturer or vendor of an article is not liable to third persons, with whom he has no contractual relations, for negligence in the manufacture or sale of such article. The plaintiff, on the other hand, contends that this case falls not within the rule, but within the exceptions to it.

This rule and its exceptions and the reasons for both have been often and elaborately discussed. Perhaps the leading cases are Huset v. J. I. Case Threshing Mach. Co. (C. C. A. 8) 120 F. 865, 61 L. R. A. 303, and MacPherson v. Buick Motor Company, 217 N. Y. 382, 111 N. E. 1050, 1051, L. R. A. 1916F, 696, Ann. Cas. 1916C, 440. The opinion in the former case was written by Judge Walter H. Sanborn, and in the latter by Judge (now Mr. Justice) Cardozo. See, also, Baxter v. Ford Motor Company et al., 168 Wash. 456, 12 P.(2d) 409, 15 P.(2d) 1118, 88 A. L. R. 521, and annotation page 527; Minutilla v. Providence Ice Cream Company, 50 R. I. 43, 144 A. 884, 63 A. L. R. 334, and annotation page 340; Flies v. Fox Brothers Buick Company et al., 196 Wis. 196, 218 N. W. 855, 60 A. L. R. 357; Victory Sparkler & Specialty Company v. Price, 146 Miss. 192, 111 So. 437, 50 A. L. R. 1454, and annotation

page 1462; Foster v. Ford Motor Company, 139 Wash. 341, 246 P. 945, 48 A. L. R. 934, and annotation page 939; Heckel v. Ford Motor Company, 101 N. J. Law, 385, 128 A. 242, 39 A. L. R. 989, and annotation page 992; Pelletier v. Dupont, 124 Me. 269, 128 A. 186, 39 A. L. R. 972; Chysky v. Drake Brothers Company, 235 N. Y. 468, 139 N. E. 576, 27 A. L. R. 1533; Davis v. Van Camp Packing Company, 189 Iowa, 775, 176 N. W. 382, 17 A. L. R. 649; Birmingham Chero-Cola Bottling Company v. Clark, 205 Ala. 678, 89 So. 64, 17 A. L. R. 667; Windram Manufacturing Company v. Boston Blacking Company, 239 Mass. 123, 131 N. E. 454, 17 A. L. R. 669, and annotation page 672.

. If Semesan had been a disinfectant intended to affect human life and which would have been destructive or injurious if improperly prepared or used, its manufacturer would have been under the obligation to use care commensurate with the dangers involved. In Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455, a poison was falsely labeled. Sale was made to a druggist, who in turn sold to a customer. The customer recovered damages from the original seller, who affixed the label. Speaking of this case, in MacPherson v. Buick Motor Co., supra, Judge Cardozo said: "A poison, falsely labeled, is likely to injure any one who gets it. Because the danger is to be foreseen, there is a duty to avoid the injury."

In Hruska v. Parke, Davis & Co. (C. C. A. 8) 6 F.(2d) 536, page 537, which involved a preparation for injection into the human body known as "Camphor Solution Neutral," this court said:

"It must be borne in mind this is not the usual case of manufacture and sale discussed by the authorities. On the contrary, defendant in this case is conducting a highly technical and specialized business, that of a manufacturing chemist. The products so prepared by it are placed on the market, to be purchased and employed in curing the ills of the human body and in preserving human life. The defendant deals with the public to be treated with its preparations and drugs, not on an equal footing, but with the understanding the public will trust to the superior intelligence and general knowledge of defendant, its agents and employees, in the manufacture and preparation of its products; also, when its compounds, drugs, and preparations are placed on the market, that they are safe, harmless and beneficial in use. In other words, the public relies on the truth of such statements employed in advertising by the defendant, and does not seek expert advice from others regarding the propriety of the use of the commodities defendant has manufactured and placed on the market. Defendant company is constantly dealing with human health and human life. It manufactures and sells compounds and drugs represented to be harmless when employed as directed, and, being so represented to the public, they must be, as represented, harmless in use."

See, also, Blood Balm Co. v. Cooper, 83 Ga. 457, 10 S. E. 118, 5 L. R. A. 612, 614, 20 Am. St. Rep. 324; Willson v. Faxon, Williams & Faxon, 208 N. Y. 108, 101 N. E. 799, 800, 47 L. R. A. (N. S.) 693, Ann. Cas. 1914D, 49.

■ The defendant, however, contends that, because its product was intended to affect only plant life, and property alone was subject to injury, it owed no duty to the plaintiff, since it had no contract with him. With that contention we do not agree. Through its advertising and literature the defendant had expressly invited the plaintiff and other growers to use its product for the purpose of disinfecting bulbs and bulblets, and, since it had undertaken to direct the manner in which it should be used, the users had a right to assume that the company had exercised such care as an ordinarily prudent manufacturing chemist would usually have used in giving the directions for the use of such a product, and had not knowingly prescribed a use which would destroy their plants.

The following cases appear to support the view that substantially the same rule applies to sales of dangerous products whether intended to affect human life or to affect property:

Kolberg v. Sherwin-Williams Co., 93 Cal. App. 609, 269 P. 975, which involved the destruction of orange trees by a spray known as "Citromulsion." The agents of the defendant in that case had represented that the spray would kill the scale and not injure the trees, fruit, or buds. It was also stated that the spray had been used on other groves with "good results." It was shown that Citromulsion was utterly unfit as a spray for orange trees and was inherently dangerous to them. The court, in sustaining a judgment for the plaintiff, said (page 977 of 269 P.): "The liability of the defendant rests upon the sound rule that a manufacturer or seller of an article inherently dangerous to life or property is liable for injuries to the ultimate consumer who has purchased through a middleman. 17 A. L. R. 674, 683."

Ellis et al. v. Lindmark et al., 177 Minn. 390, 225 N. W. 395, which involved injury to chickens caused by linseed oil negligently shipped by a wholesaler to a retailer as cod liver oil, and negligently sold by the retailer to chicken raisers for their chickens. The court held that, under the law, both wholesaler and retailer were liable, saying (page 397 of 225 N. W.): "That the negligence resulted in injury to property and not to the person should not prevent recovery."

Murphy v. Sioux Falls Serum Co., 44 S. D. 421, 184 N. W. 252, in which the court held that the plaintiff, who showed that hog cholera serum was properly administered by a veterinary, and that the hogs died, made out a prima facie case against the manufacturer of the serum.

White v. National Bank of Commerce et al., 99 Cal. App. 519, 278 P. 915, in which an orchard owner was allowed damages for injuries to fruit trees caused by a spray, although not on the basis of negligence.

Cases which seem to support the contrary view are: Windram Manufacturing Co. v. Boston Blacking Co., supra, 239 Mass. 123, 131 N. E. 454, 17 A. L. R. 669; Tompkins v. Quaker Oats Co., 239 Mass. 147, 131 N. E. 456; and the case of Huset v. J. I. Case Threshing Mach. Co., supra (C. C. A.) 120 F. 865, 61 L. R. A. 303, if the exceptions to the general rule as stated therein are to be taken literally.

In addition to the cases which recognize the duty of a manufacturer to a third person, although the manufacturer's negligence may result in the damage or destruction of property only, we have those cases in which the article manufactured, although dangerous to both life and property, damaged only property. Among these are: Quackenbush v. Ford Motor Co., 167 App. Div. 433, 153 N. Y. S. 131, holding that a third person, who purchased a car with defective brakes, could recover damages from the manufacturer for injury to the car resulting when it went over an embankment because of the defects. United States Radiator Corporation v. Henderson et al. (C. C. A. 10) 68 F. (2d) 87, in which the court held that the manufacturer of a furnace purchased by the plaintiff from a dealer was liable for the burning of the plaintiff's house which the jury found to have been the result of the defendants' negligence in failing to properly design and construct the furnace.

■ A rule which would permit a manufacturing chemist, who offered his product to the public for use in the treatment of plants or animals, to so carelessly prepare his product or to so carelessly direct the manner in which it was to be used as to destroy or injure the property of one who purchased it from a dealer and who in ignorance of its dangers used it for its intended purpose and in accordance with the directions of the manufacturer, and which would deny to the person whose property was injured any redress, although the destruction of his property was the natural, probable, and almost certain consequence of the manufacturer's negligence, should not, we think, receive the sanction of this or any other court. Our conclusion is that a manufacturer of a proprietary product intended for the specific purpose of preventing or curing the diseases of plants, animals, or human beings, which product when properly used for its intended purpose is either harmless or beneficial, but which when improperly used will cause or is likely to cause material injury, who undertakes to direct or recommend the manner in which it shall be used, owes the duty to those whom the manufacturer, through his advertising and representations, invites to purchase and use the product, of exercising reasonable care commensurate with the dangers involved in giving such directions and in the making of such recommendations. The manufacturer is not an insurer that in every instance and under all circumstances no injury will result from the use of his product as directed or recommended, but if he knows or in the exercise of reasonable care should know that if his product is used as directed or recommended it will cause or be likely to cause material injury, then he is liable to any person who, in reliance upon his representations, directions, and recommendations, uses the product for the purpose and in the manner directed and recommended by the manufacturer and who suffers injury as a direct result, unless it appears that the user also knew or in the exercise of reasonable care should have known that the use of the product would be injurious or would be likely to cause the injuries complained of.

■ For the plaintiff to recover damages in this case, we think it was necessary that it should appear from the evidence:

1. That the use of the product as directed or recommended by the Du Pont Company would ordinarily cause or be likely to cause material injury to gladiolus bulblets.

2. That the Du Pont Company knew or in the exercise of reasonable care should have known that its product if used as directed or

recommended by it would cause or be likely to cause such injury.

3. That the plaintiff used it strictly in accordance with the recommendations and directions.

4. That such use was the proximate cause of the injuries complained of.

5. That the plaintiff did not know and was not charged with knowledge that the use of the product would cause such injuries.

We think there are several reasons why a new trial will have to be granted in this case.

First. Under the charge of the court the liability of the defendant was virtually that of an insurer of the safety of its product when used as directed by it, since its liability was made to depend alone on whether the product, when so used, was imminently dangerous. Assuming that the plaintiff's evidence was sufficient to justify an inference of knowledge on the part of the defendant, the defendant was entitled to have the jury determine whether, if the product was imminently dangerous when used as directed, that fact was known or in the exercise of reasonable care should have been known to the defendant. The mere fact of injury to the bulblets from the use of Semesan would not be sufficient.

As was said by Judge Phillips in his dissenting opinion in United States Radiator Corporation v. Henderson et al., supra (C. C. A. 10) 68 F.(2d) 87, 95:

"It is an established principle that, except in exceptional cases falling within the doctrine of res ipsa loquitur, the mere fact that an accident has resulted in injury to a person or property does not authorize the presumption or inference of negligence on the part of a defendant. Looney v. Metropolitan R. R. Co., 200 U. S. 480, 486, 26 S. Ct. 303, 305, 50 L. Ed. 564; Sweeney v. Erving, 228 U. S. 233, 238, 33 S. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905; Leahy v. Detroit, M. & T. Short Line R. (C. C. A. 6) 240 F. 82.

"In Looney v. Railroad Co., supra, the court said: 'A defect cannot be inferred from the mere fact of an injury.'"

It must be remembered that we are not dealing here with a product which was utterly unfit for the purpose for which it was intended or which was imminently dangerous under all circumstances. It could be used with safety. The Du Pont Company, from aught that appears in the evidence, may have used every precaution to determine the proper manner for the use of its product in treating gladiolus bulblets and may not have known and may have had no reason to know that its directions if followed would be likely to cause injury to such bulblets. Notice that Mr. Bailey had had unsatisfactory results in treating his evergreen seedlings would not, we think, constitute notice to the defendant that its directions with reference to gladiolus bulblets were improper. There was, in our opinion, no substantial evidence to justify a finding that the Du Pont Company knew or in the exercise of reasonable care should have known that the use of Semesan as recommended by it would produce the results which it is claimed were produced. The mere fact of injury to these particular bulblets and to the bulblets of other growers in several instances not called to the attention of the Du Pont Company would not be sufficient to indicate knowledge on its part that the product when used as directed would cause or be likely to cause injury.

There is another defect in the plaintiff's proof. It shows that beyond a certain point he did not strictly comply with the defendant's directions for the use of Semesan. After immersion, he left his bulblets damp with the solution for a period of one to two weeks. The directions on the label indicated that, after treatment, "seeds" should be dried. Whether that would constitute a direction that bulblets should also be dried may be debatable, but, in any event, the defendant did not instruct the plaintiff to continue the treatment by leaving the bulblets damp with the poisonous material for a week to two weeks after immersion. As we read the plaintiff's testimony, he virtually admits that the leaving of the bulblets in damp sacks in barrels may be partly responsible, at least, for their failure to grow. The defendant's evidence showed that in the trial of a suit by Bailey against the Du Pont Company, the plaintiff stated with reference to the bulblets: "The reason they suffered more is because the small bulb is packed tight in containers and didn't have an opportunity to get ventilation."

Evidence which is equally consistent with two hypotheses tends to support neither. Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 663, 664, 21 S. Ct. 275, 45 L. Ed. 361; Chicago, M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 478, 46 S. Ct. 564, 70 L. Ed. 1041; New York Central R. Co. v. Ambrose, 280 U. S. 486, 489, 490, 50 S. Ct. 198, 74 L. Ed. 562; Gunning v. Cooley, 281 U. S. 90, 94, 95, 50 S. Ct. 231, 74 L. Ed. 720; Ewing

v. Goode (C. C.) 78 F. 442, 444; Stevens v. White City, 285 U. S. 195, 203, 204, 52 S. Ct. 347, 76 L. Ed. 699; Eggen v. United States (C. C. A. 8) 58 F.(2d) 616, 620; Claywell v. Inter-Southern Life Ins. Co. (C. C. A. 8) 70 F.(2d) 569, 571; P. F. Collier & Son Company v. Hartfeil (C. C. A. 8) 72 F.(2d) 625.

Our conclusion is that the plaintiff did not make out his case against the defendant, and that a verdict should have been directed against him.

The judgment is reversed and the case remanded for a new trial.