## ENSIGN–BICKFORD CO. v. REEVES.
### No. 10873.

Circuit Court of Appeals, Eighth Circuit.
March 7, 1938.

STONE, Circuit Judge, dissenting in part.

Haywood Scott, of Joplin, Mo. (Fred L. Williams, of St. Louis, Mo., John W. Scott, of Joplin, Mo., and Williams, Nelson & English, of St. Louis, Mo., on the brief), for appellant.

William O'Herin and Wayne Ely, both of St. Louis, Mo. (Leahy, Walther, Hecker & Ely, of St. Louis, Mo., on the brief), for appellee.

Before STONE, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

Jake Reeves, the plaintiff in this suit, suffered severe injuries including total loss

of sight by the unexpected explosion of a charge of powder while he and a man named Richard Lovell were blasting out rock in a small quarry in St. Louis county, Mo. They had used a fuse known as "Clover Brand Safety Fuse" and Reeves brought this action for damages for his injuries against the fuse manufacturer. He claimed that the fuse was defective and that the manufacturer was negligent in making and putting it out in such defective condition. There was a general verdict in his favor upon the issues submitted to the jury and judgment thereon and the manufacturing company appeals. It complains among other things that there was no evidence to support a verdict for the plaintiff and that the trial court erred in overruling its motion for directed verdict made on that ground at the close of the evidence.

Material allegations of the plaintiff's complaint were that the defendant was engaged in the manufacture and sale of fuse used for the firing of charges of high explosive in blasting operations and in the sale of its product it represented that the fuse had a burning speed of 1 foot per minute; that is, it requires 1 minute of time for 1 foot of said fuse to be burned after being lighted; that plaintiff purchased about 50 feet of the fuse from an authorized dealer and relied on such representations and believed that the fuse was reasonably safe for the purpose for which it was being used; that he was using the same to ignite high explosive with which he was blasting rock, and after preparing a charge and properly attaching a piece of the fuse thereto, he lighted the same and retired to a safe distance and waited about fifteen minutes and no explosion occurred; whereupon he returned to the site where the charge of explosive with the fuse attached was located, at which time the charge of explosive ignited by the fuse exploded and injured the plaintiff; that "defendant negligently and carelessly failed and omitted to inspect same before selling same; that said fuse was unsafe, defective and dangerous in that instead of having a burning speed of approximately one foot per minute as intended by defendant, and as represented and advertised by defendant, was so negligently manufactured and sold that this particular piece of so-called safety fuse had a greatly retarded burning speed which fact was unknown to plaintiff, but was known, or by the exercise of ordinary care would have been known to the defendant."

"Plaintiff further states that defendant knew, or by the exercise of ordinary care would have known that the particular piece of fuse here complained of was defective, which said fact was unknown to plaintiff, and defendant negligently and carelessly failed to warn plaintiff thereof."

"Plaintiff further states that as a direct and proximate result of the aforesaid defective, unsafe and dangerous condition of said safety fuse manufactured and sold by the defendant and the aforesaid explosion, the sight of both of plaintiff's eyes was totally and permanently destroyed."

The defendant answered by general denial.

It appears that at the time of the accident the plaintiff Reeves was 31 years old and was inexperienced in rock blasting. He had worked as helper around a rock quarry the year before and had seen rock blasting done and had been told how to do it, and during the period of about 2 months before the accident he had fired something more than a dozen shots in the old quarry where he was hurt. The owner of the quarry had given his permission and the plaintiff was taking out the rock for himself. He used black powder and fuse, and shortly before the accident he had bought a keg of such powder and 50 feet of Clover Brand Safety Fuse from a merchant who identified the fuse as part of a shipment received by him which had come from a magazine of the Dupont Company at Belleville, Ill. It was of defendant's manufacture and had been kept in good condition.

The plaintiff, Reeves, and Richard Lovell were the only persons present at the time of the accident, and they testified in substance that they used a hammer and drill and drilled a hole about 1½ inches in diameter to the depth of about 3 feet in the solid rock, and having cleaned it out dry, put in 2 inches of powder. Then Reeves cut off a piece of the fuse 3½ feet long from the identified roll, tied a knot at one end of it, cut holes in the knot and inserted it on top of the powder. He poured in additional powder until he had 10 or 12 inches of it in the hole, then while Lovell held the fuse he tamped dry clay on top of the powder with a broomstick. The fuse stuck up about 6 inches above the hole. Reeves split the end of the fuse, lighted it, and went a hundred yards east while Lovell went the same distance west. After waiting 15 minutes they went back to the hole and

found the fuse had burned an inch or two and gone out. Reeves cut off the burned portion, split the end of the fuse and lighted it again. After waiting for another 15 minutes they returned and found the same condition as before. After again cutting off the burned portion he relighted the fuse and waited 15 minutes more, when they returned and found that the fuse had burned so that there was only a short piece sticking out where it had burned and gone out. The men then got the load out of the hole by means of the broomstick and water and a brush and having cleaned it out they dried the hole with a rag. Reeves cut the exposed end of the fuse, lighted it and they withdrew for 15 minutes when they returned and found that a few inches of the fuse had burned and it had again gone out. He cut off the burned portion, split the end of the fuse and for the fifth time applied the lighted match and withdrew. As in each of the previous four instances the fuse "smoked and spewed." Lovell had a watch and he announced that 15 minutes was up. Reeves "mosied back" toward the hole and when he got within two or three steps of the hole the explosion occurred and the serious injuries were inflicted upon him. His face and eyes were powder burned and filled with grains of unburned powder. No clay particles were found in his face. After he had lighted the first piece of fuse three times and the second piece once and it went out as it did, the plaintiff "thought there were powder gaps in the fuse which caused it to go out." He had "heard plenty about how people had delayed explosions."

In addition to his own testimony and that of Lovell as to how the accident occurred, plaintiff introduced the testimony of an officer of defendant company to describe its manufacturing processes and methods of inspection. He also introduced the testimony of Mr. A. A. Davis, a contractor, who had done blasting. Mr. Davis knew of some instances of delayed explosions and had seen some fuse smoking and smouldering after it had been thrown out by explosion.

Mr. John Hunter also testified on plaintiff's behalf. He was a mechanical engineer 70 years of age, of extremely varied experiences, who had on occasions been engineer in charge of operations which included blasting where black powder and fuse were used. He had no familiarity with the manufacture of fuse except as he heard the officers of the defendant company describe the process in this case. For the purpose of testifying he made and caused to be made a number of tests and experiments with the particular kind of fuse used by plaintiff and had X-ray pictures made of the unused portion of the roll bought by plaintiff. He said that if the facts stated by the plaintiff as to how the accident happened were assumed to be true the fire must have reached the powder through the fuse, there must have been some defect in the fuse and that it was his opinion that the delayed explosion was caused by powder gaps in the fuse which he had examined; that he had no personal experience with powder gaps in fuse or delayed explosions traceable to that cause and he based his opinion largely on a bulletin of the United States Bureau of Mines issued in 1911, which was prior to the time the defendant began its manufacture of the particular kind of fuse here involved.

The defendant's evidence tended to show that the accident could not have happened as the plaintiff claimed; that an explosion in a tamped hole could not have blown the plaintiff's face and eyes full of unburned powder; that in such an explosion the powder would have been consumed and he would have been struck by clay and rock; that if powder gaps or powder voids are left in Clover Brand Safety Fuse it does not result in hang fires; that the fuse simply refuses to burn beyond the voids. Defendant purposely made and produced in court lengths of the fuse in which there were powder gaps and demonstrated before the jury that the fuse would not burn beyond the gaps. Men who were expert in all matters relating to blasting examined the quarry where the accident occurred and testified that there was no trace of such a blast as plaintiff claimed had injured him, but they found the remains of a hole which they were able to reconstruct with the original pieces of rock that had been split apart but fitted together exactly when reassembled. That hole was of about the depth plaintiff claimed to have drilled and it was evident there had been a "blow out shot" in the hole. That is, there had been an explosion of the charge of powder prematurely or before it had been tamped. The kind of a shot that might result if, instead of using a wooden broomstick as plaintiff claimed, he had used a metal bar likely to generate a spark if it struck against the rock or if a spark had been accidentally permitted to

reach the powder. They said that kind of a shot would fill a man's face with unburned powder if he was very close to the hole.

The methods used by defendant in making and inspecting its fuse were gone into in great detail. The company had been manufacturing fuse for more than a hundred years and its machines were turning out more than half a million feet a day. The product was entirely machine made.

Inspection machines formed part of the equipment which automatically stopped operations if the powder in the fuse was too light. Probably not more than a foot of defective fuse could run through before the machine would stop. Operators were in attendance to make inspections and necessary adjustments of the machinery and to discard any defective fuse. This was the first time within the knowledge of defendant's officers of long experience or from the records of the company that any one had claimed defendant's fuse had delayed or hung fire. Defendant's officers believed such a thing to be impossible.

It appeared, and the plaintiff stressed the fact, that neither the fuse making machine nor the inspection machines always function perfectly. Sometimes threads break and sometimes a bristle from the brushes used in the machinery has been known to get into the powder tube or possibly a splinter of wood out of the powder barrels. The powder might stop flowing or might flow unevenly. There may be breakdowns of either the fuse machines or the inspection machines. So that as counsel for the plaintiff express it in the brief, "this fuse can come out of the fuse machine with insufficient powder or no powder at all in the powder core." It is possible.

But there was no testimony that the machinery used by defendant was in any way inferior or defective or that the means employed by defendant for the inspection of its fuse and the detection of defects were improper or that any better machinery or means or methods of inspection were known or followed in fuse manufacturing. There was no evidence that the defendant knew that any fuse turned out by it was defective or that any facts had come to its knowledge to apprise it that its fuse could be dangerously defective in the respects claimed by plaintiff or that it would hang fire.

The theory upon which the case was submitted to the jury appears from the following parts of the court's charge:

"* * * if you find that said explosion of said blasting powder was set off by said fuse fifteen minutes or more after it was lighted by the plaintiff; then if you find that said fuse was defective in any one or more of the following respects, to-wit: (a) in that there was not a sufficient amount of powder in said fuse; (b) or that there was a powder gap in said fuse; and if you further find that any such defect, if any, was due to the negligence of the defendant by reason of the defendant's failure to use reasonable care in the manufacture of said fuse, or by reason of the failure of the defendant to use reasonable care in the inspection of said fuse during the process of manufacture or after it was manufactured, and if you further find that by reason of any one or more of such defects the burning of said fuse was unduly delayed, and that said fuse, by reason of any one or more of such defects, if any, burned for fifteen minutes or more, and then ignited the blasting powder in the said hole, and caused it to explode, and that as a direct result thereof the plaintiff was caused to be injured, and if you further find that said piece of fuse would have exploded said charge within two and one-half to three and one-half minutes, or thereabouts, if it had not been defective, then, in that event, your verdict must be in favor of the plaintiff, Jake Reeves, and against the defendant, Ensign-Bickford Company."

"The Court charges you, gentlemen of the jury, that the fact that the explosion occurred, resulting in injury to plaintiff, does not of itself entitle the plaintiff to recover a verdict in this case. You can not return a verdict for the plaintiff in this case unless the evidence establishes to your reasonable satisfaction that the explosion was directly due to, and caused by, a fuse defective in the particulars claimed by the plaintiff, and not from any other cause, and that such defect, if any, was due to negligence on the part of the defendant in the manufacture and inspection of said fuse. On this point the Court charges and instructs you that you must not presume that defendant was negligent in the manufacture or inspection of said fuse in the particulars claimed by plaintiff, because negligence is never presumed, but must be proved, and you can not find the defendant negligent in the manner claimed by the plaintiff unless from the greater weight of the credible evidence it has been proved and established to your reasonable satisfaction that it was

negligent in said particulars, and that said negligence directly caused the defect, if any, claimed by plaintiff to have been in said fuse, and, in addition, that said defect, if any, caused said three and one-half foot length of fuse to burn through, from the time it was lighted, in more than fifteen minutes."

In view of the court's charge the verdict of the jury in favor of the plaintiff reflects the jury's finding that the explosion was caused by a fuse which was defective either because there was not a sufficient amount of powder in it or because there was a powder gap in it, and that the fuse was so defective because the defendant failed to use reasonable care in its manufacturing and inspection processes or methods.

We think there was no evidence before the jury to justify the conclusion that the defendant was guilty of such negligence. The jury had before it the proof as to what the defendant's manufacturing, and inspection processes were, but there was no proof as to the general state of the art of fuse manufacturing in respect to the matters in question. In the absence of any proof that better methods of manufacture or inspection were available to the defendant there was no basis for the finding that defendant was negligent in failing to use better means than it did use. So far as the evidence discloses the defendant may have followed in every respect the best known methods to produce fuse that was safe for use. There is no evidence to the contrary.

■■ The use of such fuse as is here in question is to convey fire to the charge of explosive slowly and in approximately measurable time, allowing the workmen opportunity to retire to a safe distance. The fuse is not itself dangerous to life or limb and one who manufactures and sells such fuse is not an insurer of the product. Cf. Amason v. Ford Motor Co., 5 Cir., 80 F.2d 265. The law requires him to use care in making it and inspecting it which is commensurate with the dangers involved in its intended use. Davlin v. Henry Ford & Son, 6 Cir., 20 F.2d 317; Dupont De Nemours & Co. v. Baridon, 8 Cir., 73 F.2d 26; Favo v. Remington Arms Co., 67 App.Div. 414, 73 N.Y.S. 788. But absent any showing that his machinery, materials, designs or methods were faulty or that he had failed to use proper care, he cannot be held liable for such an occurrence as the plaintiff has

described in his testimony. If it be assumed that the plaintiff's testimony as to how the accident happened was true, and if it be further assumed that there was one very small piece out of the many millions of feet of defendant's fuse which had the defect of hanging fire for 15 minutes and then conveying the spark to the powder charge, such facts are not in themselves sufficient to convict defendant of actionable negligence toward the plaintiff. The burden of proof was upon the plaintiff to establish that the defendant was guilty of some lack of due care, that it did something or failed to do something which prudence forbade or required and which was the proximate cause of the injuries.

Nor does the fact that the defendant's machines fail of ideal perfection establish a lack of care or negligence on the part of defendant or charge it with notice that its product would be dangerously defective in the particulars relied on by plaintiff. It was not a question of a defect that would let a spark go through the fuse quickly and set off the charge prematurely. Even if there was a possibility known to defendant that a rare piece of fuse might come out of its machines with a powder gap in it, there was nothing to indicate to defendant that a powder gap would or might cause a delayed explosion. Its experience and experiments indicated that in this type of fuse a powder gap would do nothing more than cause the fuse to go out. There was no proof that it ever had any notice or information to the contrary. E. I. Dupont de Nemours Powder Co. v. Duboise, 5 Cir., 236 F. 690; E. I. Dupont Co. v. Baridon, 8 Cir., 73 F.2d 26. See Lynch v. International Harvester Co., 10 Cir., 60 F.2d 223.

The plaintiff has cited the following cases to justify the verdict and judgment: McClaren v. Weber Bros. Shoe Co., 1 Cir., 166 F. 714; United States Radiator Corporation v. Henderson, 10 Cir., 68 F.2d 87; Bradford Glycerine Co. v. Kizer, 6 Cir., 113 F. 894; Wiita v. Interstate Iron Co., 103 Minn. 303, 115 N.W. 169, 16 L.R.A.,N.S., 128. The first was a suit by an employee against his employer for injuries caused by the breaking of a needle in a defective sewing machine in a shoe factory. There was expert testimony found by the court to be proper and relevant showing that the break was caused by defects in the machine and that the machine had not been kept in repair. In the second case a home owner sued a furnace company for damages re-

sulting from a fire. There was competent testimony that the defendant was guilty of negligence in designing and making the smoke hood of the furnace without means of attaching it to the dome so it would not be displaced by explosions, thus causing release of flame under and in proximity to the ceiling. A similar case involved a negligently designed and constructed coffee urn. Reed & Barton Corp. v. Maas, 1 Cir., 73 F. 2d 359. The third case involved injuries caused by a spontaneous explosion of nitroglycerine. The evidence showed that if nitroglycerine was properly manufactured it would not explode spontaneously, but if it was impure it would so explode. It was not shown directly how the nitroglycerine in question had been made but the jury could infer that it was negligently made from the fact that it exploded spontaneously. The court said the explosion raised a presumption of negligence if there was no explanation of the real cause of the explosion.

In the fourth case a miner was injured by a premature explosion. It appeared that there were two kinds of fuses used in the mines in Minnesota and the evidence as to which one was safer for the work in hand was conflicting. The court said that if the fuse which was furnished was a reasonably safe article the defendant was not negligent. But there was evidence to support the plaintiff's claims that the fuse was not reasonably safe, that the employer had notice of its defective character and upon the conflicting evidence the jury was justified in finding that the employer was negligent in failing to provide the safer fuse.

■ We think the cases cited are not applicable to the facts in this case. Whether actionable negligence is shown must always depend upon the circumstances of the particular case. It must be determined from the peculiar facts whether taking that view of the evidence most favorable to the plaintiff it can be fairly inferred that the defendant has put out a dangerously defective article as a result of the lack of due care on its part. In the cases cited there was sufficient proof of negligence. Here such proof was lacking even if it be assumed that a powder gap in the fuse was the cause of a delayed explosion which injured the plaintiff.

■ The only testimony to the effect that a powder gap in defendant's Clover Brand Safety Fuse could cause a 15 minutes' delay in that explosion of the charge was the opinion to that effect given by the plaintiff's witness, John Hunter. It was apparent from Mr. Hunter's own testimony that he had no experience with or information about the fuse or its properties upon which to base such an opinion. His first information about the manufacture of fuse was when he heard a description of the process in this case. He had neither practical nor theoretical education on the subject to which the opinion related. Of all the experiments and tests made with the fuse to his knowledge none indicated that a delayed explosion would come from a powder gap in it. So far as the defendant's fuse was concerned all of the competent evidence given by the witnesses who were qualified by training, study and experience indicated that, under the conditions described by plaintiff, powder gaps in the fuse would have caused it to go out. Mr. Hunter's opinion to the contrary was within the field of speculation and was not substantial or competent evidence. Svenson v. Mutual Life Insurance Co. of New York, 8 Cir., 87 F.2d 441.

The motion for directed verdict should have been sustained for want of substantial testimony for the plaintiff.

Reversed and remanded.

STONE, Circuit Judge. I concur in reversing and remanding this case on the ground of an error in the charge. I think the evidence was sufficient to justify submission to the jury.