FIRST TRUST & SAVINGS BANK et al. v. IOWA–WISCONSIN BRIDGE CO. (KENDRICK, et al., Interveners).*

No. 11055.

Circuit Court of Appeals, Eighth Circuit.
Aug. 8, 1938.

*Rehearing denied Sept. 14, 1938.

Vincent L. Boisaubin and Lon O. Hocker, both of St. Louis, Mo. (Frank Y. Gladney and Jones, Hocker, Gladney & Grand, all of St. Louis, Mo., on the brief), for appellants.

William C. Green, of St. Paul, Minn., and F. A. Ontjes, of Mason City, Iowa (Charles N. Dohs, of St. Paul, Minn., on the brief), for appellees.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This is an appeal in equity from a decree denying foreclosure of a Mortgage Trust Deed. Bechtel Trust Co. v. Iowa-Wisconsin Bridge Co., D.C., 19 F.Supp. 127.

The trust deed, dated January 1, 1932, but actually executed February 20, 1932, was given to secure a bond issue of $200,-000. It conveyed to the complainant trustees all the property of the defendant including a bridge across the Mississippi river at Lansing, Iowa. The trustees named therein were the Bechtel Trust Company, now called First Trust and Savings Bank, an Iowa corporation, and A. H. Schubert, a citizen of Wisconsin. The grantor, Iowa-Wisconsin Bridge Company, is a Delaware corporation.

On August 28, 1933, the bill of foreclosure was filed in the district court by the trustees, complainants, against the bridge company, defendant. The bill alleged jurisdiction based upon diversity of citizenship, the authority of the trustees to sue under the terms of the trust deed, default, and acceleration of the due date. The prayer was for foreclosure and sale and the appointment of a receiver. The defendant bridge company filed answer September 25, 1933, admitting the jurisdiction of the court, the execution of the trust deed and the issuance of the bonds; denying complainants' right to the appointment of a receiver; alleging that a part or all of the bonds secured by the trust deed were

invalid; and praying the protection of the court. On September 26, 1933, the court appointed a receiver of all of the property of the bridge company with direction to take immediate possession and to operate its business.

On December 5, 1933, by leave of court, Fayette D. Kendrick, a stockholder of the bridge company and citizen of Minnesota, intervened on behalf of defendant, praying that the complainants' bill be dismissed, the bonds cancelled and the deed of trust set aside. He alleged that the bridge company was and had been since 1930 dominated by one J. A. Thompson and his associates; that by the exercise of such domination these men had fraudulently procured the execution and delivery of the trust deed and the issuance of the bonds to themselves or to corporations controlled by them. Kendrick then moved that certain corporations alleged to be controlled by Thompson including Phoenix Finance System, Inc., and Phoenix Finance Corporation, Delaware corporations, be made parties. This motion was granted. Thereafter Phoenix Finance Corporation appeared and filed answer to the petition of intervention. Inasmuch as the district court found that Phoenix Finance Corporation was in all respects so far as concerns this case the successor of Phoenix Finance System, Inc., and was managed by the same officers, both corporations are hereinafter indiscriminately referred to as Phoenix. The answer of Phoenix denied the charges of fraud and alleged that the corporation was the owner of a large amount of the bonds. Other stockholders of the bridge company, residents of Iowa, intervened and adopted the pleadings filed by Kendrick. By order of court, the petition of intervention was considered as an answer to the bill of foreclosure.

On December 5, 1934, counsel for the parties agreeing, the court appointed a special master to hear all the issues and to report his findings of fact and conclusions of law. The master, after taking evidence, filed a comprehensive report on March 18, 1936, to which all parties excepted. After a hearing on the exceptions the court adopted the findings of the master, with slight modifications hereafter noted, and amplified them with additional findings. On December 1, 1936, the court entered its decree: "That the mortgage and bonds in suit were fraudulently issued.

That all bonds are without valid consideration; with the exception of the bonds aggregating $15,000," which were specified. Foreclosure was denied, but the receivership was continued for the purpose of impounding the income of the bridge company until the $15,000 of obligations found to be meritorious should be paid. On December 19, 1936, Phoenix moved the court to vacate all orders entered in the cause and to dismiss the cause without prejudice on the ground that "no diversity of citizenship exists upon which jurisdiction in this suit is based." A similar motion was filed by the trustees. Both motions were overruled. Thereafter complainants filed a petition for rehearing, or in the alternative to modify the decree. The petition was overruled.

On this appeal two classes of error are assigned: (1) That the district court was without jurisdiction because diversity of citizenship did not exist; and (2) errors occurring in the proceedings in the lower court. The attack on the jurisdiction will be first considered.

With respect to the jurisdiction of the district court, it must be conceded that prior to the joining of Phoenix as a party there was complete diversity of citizenship. It is appellants' contention that Phoenix is a proper, necessary, and indispensable party, and that after it was joined as a plaintiff diversity of citizenship no longer existed because both Phoenix and the defendant bridge company are citizens of Delaware. Appellees say that Phoenix is only a formal and not an indispensable party, and that therefore its citizenship is not material to the question of jurisdiction.

It is settled that jurisdiction of the federal court can not be defeated by the joinder of an unnecessary party, Cella v. Brown, 8 Cir., 144 F. 742, certiorari denied 202 U.S. 620, 26 S.Ct. 766, 50 L.Ed. 1174; Egyptian Novaculite Co. v. Stevenson, 8 Cir., 8 F.2d 576, 579; and the bringing in of an unnecessary party after the commencement of the suit will not oust the jurisdiction. Sioux City Terminal Railroad & Warehouse Co. v. Trust Co. of North America, 8 Cir., 82 F. 124, affirmed 173 U.S. 99, 19 S.Ct. 341, 43 L.Ed. 628; Weiland v. Pioneer Irrigation Co., 8 Cir., 238 F. 519, affirmed 259 U.S. 498, 42 S.Ct. 568, 66 L.Ed. 1027; Phelps v. Oaks, 117 U.S. 236, 240, 6 S.Ct. 714, 29 L.Ed. 888.

420

The question here presented, in its simple form, is whether under the facts of this case a bondholder is a necessary and indispensable party in a suit brought by the trustees to foreclose the trust deed where the defense is the invalidity of the trust deed and the bonds because of fraud in their inception.

Looking to the language of the trust deed alone it is apparent that the trustees are the only necessary and indispensable parties plaintiff. The trust deed made it the duty of the bridge company to pay taxes on the mortgaged property, to pay interest on the bonds, and to pay the bonds as they matured. In case of default for a period of sixty days it was provided that the trustees may, and upon the written request of the holders of 25 per cent of the bonds then in default, shall declare the principal of all the bonds due, and "shall proceed to protect and enforce their rights and the rights of the bondholders under this Indenture by a suit or suits in equity, or at law, * * * by * * * foreclosure hereunder, or for the enforcement of any other appropriate, legal or equitable remedy, as the Trustees * * * shall deem most effectual."

It is further provided in the trust deed that "No holder of any bond or coupon secured hereby shall have any right to institute any suit, action or proceeding in equity or law, for the foreclosure of this Indenture," except in case the trustees after notice and demand refuse to act.

The suit was commenced by the trustees at the request of Phoenix, holder of more than 25 per cent of the bonds, and was prosecuted by attorneys selected by it.

One of the questions raised in connection with the matter of jurisdiction relates to the applicable law. It is settled that federal courts of equity look to the law of the state for the ascertainment of rights of a substantive character; but in questions of remedy the equity jurisdiction of the national courts under the Constitution and laws is uniform throughout the United States and can not be limited in its extent or controlled in its exercise by the laws of the states. Watts v. Camors, 115 U.S. 353, 6 S.Ct. 91, 29 L.Ed. 406; Carolina Power & Light Co. v. South Carolina Public Service Authority, 4 Cir., 94 F.2d 520, 525; Mathis v. Hemingway, 8 Cir., 24 F.2d 951. Cf. A. & R. Realty Co. v. Northwestern Mut. Life Ins. Co., 8 Cir., 95 F.2d 703, 707; Henrietta Mills v. Rutherford County, 281 U.S. 121, 127, 50 S.Ct. 270, 272, 74 L.Ed. 737. The Conformity Act of 1872, 28 U.S.C.A. § 724, by its terms is not applicable to equity causes.

In so far as the right here involved is substantive it is controlled by the laws of Iowa and Wisconsin, in which states the property is situated. Section 10968 of the Code of Iowa of 1935 provides: "A trustee of an express trust, a party with whom or in whose name a contract is made for the benefit of another, or party expressly authorized by statute, may sue in his own name, without joining with him the party for whose benefit the action is prosecuted." In the case of Tucker v. Silver, 9 Iowa 261, 262, the Supreme Court of Iowa said: "The general rule, independent of the Code, is, that a trustee is a necessary party;" and it was held that the provisions of the code do not change the rule. See also, Bennett Savings Bank v. Smith, 171 Iowa 405, 408, 152 N.W. 717; In re Receivership of Selway Steel Post & Fence Co., 198 Iowa 950, 957, 958, 200 N.W. 621; Fransham v. Tow Bros., 196 Iowa 1082, 196 N.W. 71. The Wisconsin rule is the same. Hays v. Lewis, 21 Wis. 663; Milwaukee Trust Co. v. Van Valkenburgh, 132 Wis. 638, 112 N.W. 1083.

If the right in question be regarded as remedial only the federal rule effects the same result and is equally clear. Equity Rule 37, 28 U.S.C.A. following section 723, provides that, "Every action shall be prosecuted in the name of the real party in interest, but an executor * * * trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another * * * may sue in his own name without joining with him the party for whose benefit the action is brought."

Under this rule it has been held that unless the trustee of an express trust refuses to act or is otherwise disqualified such trustee is an indispensable party and the joinder of a beneficiary will not defeat jurisdiction. Susquehanna & W. V. R. & Coal Co. v. Blatchford, 11 Wall. 172, 175, 20 L. Ed. 179; Knapp v. Railroad Co., 20 Wall. 117, 123, 22 L.Ed. 328; Dodge v. Tulleys, 144 U.S. 451, 456, 12 S.Ct. 728, 36 L.Ed. 501; Bullard v. Cisco, 290 U.S. 179, 190, 54 S.Ct. 177, 181, 78 L.Ed. 254, 93 A.L.R. 141; Hamer v. New York Railways Co., 244 U.S. 266, 37 S.Ct. 511, 61 L.Ed. 1125; Richter v. Jerome, 123 U.S. 233, 8 S.Ct. 106, 31 L.Ed. 132; Kerrison v. Stewart, 93 U.S. 155, 23 L.Ed. 843; Mexican Central Railway Co. v.

Eckman, 187 U.S. 429, 23 S.Ct. 211, 47 L.Ed. 245; Allen-West Commission Co. v. Brashear, C.C., 176 F. 119, 121; Smith v. Bell, 8 Cir., 217 F. 243, 244.

The Supreme Court said in Dodge v. Tulleys, supra, where there was but one beneficiary (page 730): "Whether one [beneficiary] or many, the trustee represents them all, and in his name the litigation is generally and properly carried on. The fact that the beneficiary in a trust-deed may be a citizen of the same state as the grantor, would not, if the trustee is a citizen of a different state, defeat the jurisdiction of the federal court."

█ Furthermore, it is plain that the district court acquired complete jurisdiction over the mortgaged property when the suit was commenced and the receiver took possession. Palmer v. Texas, 212 U.S. 118, 29 S.Ct. 230, 53 L.Ed. 435; Marcell v. Engebretson, 8 Cir., 74 F.2d 93. At that time, before Phoenix became a party, there was complete diversity of citizenship. Had Phoenix not become a party the court could have proceeded to final judgment, granting or denying foreclosure. It could have decided every issue, including the validity of the trust deed and the amount of the debt secured thereby; and the decree would have been binding upon the bondholders without their presence as parties to the record. Shaw v. Little Rock & Ft. Smith Ry. Co., 100 U.S. 605, 25 L.Ed. 757; Elwell v. Fosdick, 134 U.S. 500, 10 S.Ct. 598, 33 L.Ed. 998; Kerrison v. Stewart, 93 U.S. 155, 23 L.Ed. 843; Richter v. Jerome, 123 U.S. 233, 8 S.Ct. 106, 31 L.Ed. 132.

█ Appellants contend that the proceeding below was a consolidation of two separate and distinct suits, one brought by the trustees to foreclose the trust deed and one brought by the bridge company and interveners to cancel the bonds held by Phoenix; and that jurisdiction as to each controversy must be determined separately. This contention is without merit. The object of the interveners was to have the trust deed and the bond issue as an entirety decreed to be void as a complete defense. The lower court acted upon that theory. It is true, as appellants point out, the appellees made no specific allegations of fraud on the part of the minority bondholders. But the petition of intervention did allege that the execution of the trust deed and the issuance of bonds were a part of a fraudulent scheme on the part of Thompson and his associates, and that none of the bonds had passed to bona fide purchasers. It was the duty of the court before decreeing foreclosure, to pass upon the validity of the deed of trust. Speers Sand & Clay Works v. American Trust Co., 4 Cir., 20 F.2d 333, 336. Further, if the controversy between the two Delaware corporations should in any way be considered as a separate controversy involving only the validity of certain of the bonds, then it was ancillary to the foreclosure proceeding, and jurisdiction attached irrespective of citizenship, because the subject matter had been drawn into the federal court under the receivership before Phoenix became a party. Morgan's Louisiana & T. R. & S. S. Co. v. Texas Central Ry. Co., 137 U.S. 171, 201, 11 S.Ct. 61, 34 L.Ed. 625; Krippendorf v. Hyde, 110 U.S. 276, 4 S.Ct. 27, 28 L.Ed. 145. The court did not err in overruling appellants' attack on the jurisdiction.

The combined specifications of error of the various appellants assailing the proceedings in the district court present the following contentions:

1. In the transactions leading to the execution and delivery of the trust deed and the issuance of the bonds there was no fraud, no domination or control or overreaching of the bridge company by Thompson and his associates. Even if there were fraud the trust deed and bonds were valid.

2. The bridge company received full consideration for the bonds.

3. The decree is erroneous because it denied foreclosure and sale for the benefit of those holders of bonds who were meritorious creditors of the bridge company to the extent of $15,000.

4. The decree is broader than the issues.

5. Phoenix Finance Corporation is entitled to foreclosure for the bonds held by it.

6. The court erroneously denied the petition for rehearing.

7. The court erred in refusing to modify the decree and to compel the defendant bridge company to restore to Phoenix 517 shares of bridge company stock given in exchange for bonds.

█ The first two of these contentions involve findings of fact rather than questions of law. The appellants insist that the evidence does not sustain the findings of the master and of the district court upon these issues. Their findings are presumptively correct, and a very heavy burden rests upon the party who attacks them on appeal.

Davis v. Schwartz, 155 U.S. 631, 636, 15 S. Ct. 237, 39 L.Ed. 289; Schock v. Malloy, 8 Cir., 26 F.2d 621, 623; Tyronza Special School Dist. v. Speer, 8 Cir., 94 F.2d 825.

To bring into view the grounds on which it is claimed the court erred in the particulars alleged calls for a brief survey of the history of the bridge company, of the facts in evidence and of the findings and conclusions of the court.

The court found and the evidence discloses that about March 20, 1928, the Lansing Bridge Company was organized under the laws of Delaware to construct and operate a bridge across the Mississippi river from Lansing, Iowa, eastward to the Wisconsin shore. In June the name of the company was changed to Iowa-Wisconsin Bridge Company. The corporation was authorized to issue no par common stock and preferred stock with a par value of $100 a share, the respective amounts of which were changed from time to time by amendment of the articles of incorporation. The articles provided that if less than all the shares of the preferred stock were redeemed the selection of shares to be redeemed must be made by lot or pro rata, and that 30 days written notice of intention to redeem must be mailed to holders of stock to be redeemed. And the statutes of Delaware, Rev.Code Del.1935, § 2051, provided that no corporation should use its funds or property to purchase its own stock, when such use would impair the capital of the corporation.

The bridge was originally promoted in 1929 by residents of Lansing, Iowa. They employed Vernon W. O'Connor and John W. Shaffer of Minneapolis, Minnesota, as promoters of the bridge company. As such promoters O'Connor and Shaffer acted through the medium of the Standard Shares Holding Company and John W. Shaffer & Company. Shaffer owned all of the stock of both these corporations, except qualifying shares of other directors. On October 26, 1929, a contract was made between the bridge company and Standard by the terms of which Standard was designated as trustee of the bridge company. This contract authorized the trustee to construct and operate the bridge "either directly or by other persons or corporations with whom it shall contract * * *" at a cost not to exceed $600,000. The bridge was to be completed by October 1, 1930. On November 12, 1929, the power and authority of

Standard was further increased by a resolution of the board of directors of the bridge company by the terms of which Standard was appointed "reorganization manager, agents and trustees for the Company." Standard was authorized to enter into contracts for completing the bridge, was given 4000 shares of the bridge company stock for its services, and was vested with the "management of the fiscal affairs of the Company." Shaffer thus acquired complete control of the bridge company through the medium of his Standard Shares Holding Company and its ownership of bridge company stock. Contracts were promptly made for building the bridge.

On November 9, 1929, the bridge company entered into a contract with Shaffer employing him as engineer to make plans for and to supervise the construction of the bridge. For his compensation he was to receive "10 per cent of the total cost of the construction of said bridge, causeways and approaches." On April 4, 1930, this contract was assigned by Shaffer to John W. Shaffer & Co.

On December 9, 1929, Standard, acting as trustee for the bridge company, entered into a grading contract with Vernon W. O'Connor at an agreed price of 24 cents per cubic yard of excavation. O'Connor sublet the grading to Kramer & Hogg at 15 cents per cubic yard, and on April 4, 1930, assigned the contract to John W. Shaffer & Co.

Likewise on December 9, 1929, acting as trustee and agent for the bridge company, Standard, by Shaffer as president, entered into a contract with O'Connor for the erection of the substructure of the bridge at a cost of $193,196.80 with a provision for extras on the basis of cost plus 15 per cent. This contract was also assigned by O'Connor to John W. Shaffer & Co. on April 4, 1930. He had previously sublet the contract to Industrial Contracting Company on such terms that the final cost to his assignee was $97,976.36.

On April 1, 1930, O'Connor was elected president of the bridge company, and Shaffer, who had been the secretary of the bridge company, resigned, and his personal secretary was elected to fill the office. At that time Standard held 4000 out of the 4641 outstanding shares of bridge company stock.

By October, 1930, the grading and substructure were nearly completed. No con-

tract had been let for the erection of the superstructure. The work had been financed through the sale of bridge company stock. The sale of stock had slowed up, and Shaffer and Standard, the trustee, were confronted with the necessity of working out a plan to finance the completion of the bridge through the sale of more stock.

It was at this point that Shaffer entered into negotiations with John A. Thompson of Des Moines, Iowa, a promoter and financier, who had an office with Shaffer and his corporations and business interests in Minneapolis. Thompson carried on his financial and other business operations largely by means of a group of owned, controlled and affiliated corporations. Only three of these corporations are of interest here. They are Thompson & Company, Phoenix Finance System, Inc., and its successor in interest Phoenix Finance Corporation.

The master and the court found that Shaffer and Thompson entered into an "agreement" in reference to handling the affairs of the bridge company in October or November, 1930. It is clear from what followed that an understanding of some sort was arrived at between them designed to complete the financing and construction of the bridge, and, as the appellees claim, to exploit the purchasers of stock and fraudulently to take the bridge from the defendant company. On November 1, 1930, Thompson was made president of the bridge company, and, if he had not learned before that date, he was soon made familiar with its history, with its financial condition, and with Shaffer's manipulation of its affairs.

For the accomplishment of their purpose a series of contracts were entered into all relating to the same end. While these contracts bear different dates, which in some instances appear confusing, their subject matter and the relation of the parties bear evidence that they were all in contemplation by their designers at the same time.

On November 11, 1930, a contract was executed between John W. Shaffer & Company, by Shaffer its president, and Iowa-Wisconsin Bridge Company, by J. A. Thompson its president, by the terms of which John W. Shaffer & Co. agreed to furnish the material and complete the superstructure of the bridge for $10,000 cash and 3200 shares of the capital stock of the bridge company, with a provision for ex-

tras. The work was to proceed with sufficient dispatch that the bridge would be open for traffic by March 10, 1931. The contractor agreed to furnish a surety bond at the expense of the owner. Subsequently Thompson waived the giving of the surety bond.

Evidently in anticipation of the making of the foregoing contract, John W. Shaffer & Co. entered into a contract on November 8, 1930, with McClintic-Marshall Company for the purchase of the steel for use in the construction; and on November 11, 1930, Shaffer & Co. sublet the contract for the erection of the steel superstructure to Industrial Contracting Co. on a unit price basis with a guaranteed maximum cost of $141,734. Both contracts provided for punctual payments on work done at short intervals.

Another of this series of contracts is dated November 10, 1930, the parties to which were Phoenix, by J. A. Thompson, president; John W. Shaffer & Co., by Shaffer, president; and the bridge company, by O'Connor, chairman of the board. This contract provided (1) that in consideration of 140 shares of bridge company stock Phoenix guaranteed the cash payments to be made by John W. Shaffer & Co. to McClintic-Marshall Co. and to Industrial Contracting Co. under their subcontracts for steel and the erection of the superstructure; (2) Shaffer & Co. agreed to make the guaranteed payments promptly; (3) the bridge company agreed that in the event Phoenix was required to make any payments under its guaranty for Shaffer & Co. the bridge company would on demand pay Phoenix an equal sum with interest at 8% after March 1, 1931; (4) Shaffer & Co. further agreed to furnish a standard completion bond guaranteeing completion of the bridge. The contract further provided (5) that in case of default in any payment to Phoenix it should have the right to take possession and control of the bridge. The 140 shares of stock were actually issued to Phoenix on November 1 and disposed of by the latter prior to November 9.

About the time the foregoing contracts were made, the exact date not appearing in the record, John W. Shaffer & Co. sold to Thompson & Co. the 3200 shares of the bridge company stock issued under the superstructure contract of November 11, 1930, at a price of 70 and took in payment

Thompson & Company's note for $224,000. The deal was made with J. A. Thompson acting for Thompson & Company. The note was fully paid in installments.

On November 26, 1930, a "Stated Settlement Agreement" was executed between Standard and the bridge company. This settlement terminated the trust agreement of October 26, 1929. Standard accounted for 3509½ shares of stock sold by it at $100 per share, returned assets which were ultimately liquidated for about $80,000, and turned back the bridge company stock held by it, except 1500 shares which were later surrendered in consideration of a contract to manage the bridge after completion.

During the following winter, for the purpose of expediting the sale of stock, Thompson sought the aid of the Elliott-Rodgerson Company of Minneapolis. Thompson assured the officers of that company that $750,000 would be the entire capitalization of the bridge, that no mortgage would be placed upon it and no bonds would be issued. Relying upon these representations, which were passed on to the public, Elliott-Rodgerson Company sold to the public about $100,000 worth of bridge company stock at $100 per share.

On March 10, 1931, a directors meeting, attended by four directors, was informed by Thompson that the funds from the sale of stock were not adequate to finance the rapid completion of the bridge. The directors thereupon authorized and the officers executed a mortgage upon all of the company's assets to Phœnix to secure a loan of $50,000. Checks for $35,000 and $15,000 were drawn by Phœnix, endorsed by the bridge company, and returned to Phœnix.

The bridge was completed and opened on June 17, 1931.

On October 23, 1931, at a meeting of the board of directors of the bridge company Oscar Thorson, who was then secretary of the company and one of the directors elected at Thompson's request, stated that another $40,000 was needed to pay off pressing creditors, who were not named. Consideration of this matter was postponed until the meeting of November 10, 1931, when the directors authorized the $200,000 bond issue which is the subject of this suit. On December 22, 1931, a meeting of stockholders approved the bond issue.

The consideration claimed by appellants to have been paid by the parties to whom the bonds were issued may be summarized as follows:

To Phœnix in consideration of

| | | |
|---|---|---|
| 1. In exchange for its mortgage dated March 10, 1931. | | |
| Principal of mortgage | $50,000.00 | |
| Accrued interest | 3,548.56 | |
| Allowance to give 8% yield on bonds | 12,727.31 | |
| | | $ 66,275.87 |
| 2. For advancements under guaranty contract of November 10, 1930. | | |
| To Industrial Contracting Co. | 10,000.00 | |
| To McClintic-Marshall Co. | 11,262.71 | |
| | | 21,262.71 |
| 3. Paid Kramer & Hogg to discharge mechanic's lien | | 9,000.00 |
| 4. Cash | | 461.42 |
| 5. In exchange for 517 shares of bridge company stock with accrued interest | | 60,500.00 |
| 6. As security for | | |
| Payment of taxes | $ 3,125.00 | |
| Advancements | 14,610.19 | |
| | $17,735.19 | |
| | | 20,100.00 |
| To attorneys as security for fee of | 4,000.00 | 10,000.00 |
| To Anderson for claim of | 6,000.00 | 7,400.00 |
| To five claimants for | 5,000.00 | 5,000.00 |
| | $15,000.00 | |
| | | $200,000.00 |

It will be observed that of the total issue $22,400 of bonds were issued as security or in payment of claims against the bridge company by claimants other than Phœnix for obligations aggregating $15,000, and the remainder of the bonds in the sum of $177,600 were issued to Phœnix. The court and the master both found that the $15,000 of claims were meritorious, and the decree provided for their payment by the receiver.

The important issue in the case is the question of the sufficiency of the consideration for the $177,600 of bonds issued to Phœnix. The court found that Thompson deliberately planned to defraud the bridge company. We shall pass by several findings of the court supporting in some measure this conclusion and direct our inquiry more particularly to the bond issue. It is not disputed that Thompson during the period under review was president of the bridge company and also of Phœnix, and that others of his associates were members of the board of directors or held other offices in both corporations.

The rule for the guidance of the court in passing upon all these transactions was stated by the Supreme court in Geddes v. Anaconda Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425, as follows: "The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328; Thomas v. Brownville, Ft. Kearney & Pacific R. Co., 109 U.S. 522, 3 S.Ct. 315, 27 L.Ed. 1018; Wardell v. Railroad Co., 103 U.S. 651, 658, 26 L.Ed. 509; Corsicana National Bank v. Johnson, 251 U.S. 68, 90, 40 S.Ct. 82, 64 L.Ed. 141." Compare McCandless v. Furland, 296 U.S. 140, 158, 56 S.Ct. 41, 46, 80 L.Ed. 121.

We turn to the record. The bonds issued to Phœnix were authorized by two resolutions of the board of directors of the bridge company. The first resolution was adopted March 7, 1932, and authorized the bonds included in the first five items of the foregoing summary aggregating $157,500. The second resolution was adopted July 7, 1933, and authorized the sixth item on the summary. The directors present at both meetings included Thompson and persons selected as directors by him. Other members of the board were absent.

The first item on the summary in exchange for which bonds were authorized was the $50,000 mortgage dated March 10, 1931, including interest and discount on the bonds to make them yield the equivalent of 8%. The master and the court found that this mortgage was procured by fraud and was without consideration. The evidence supports the finding. The alleged consideration was two checks of $35,000 and $15,000 each given by Phœnix to the bridge company under date of March 11, 1931. While entries were made on the books indicating that the bridge company received and paid out $50,000 on March 10, the circumstances justify the court's finding that the company received no benefit from the transaction. The checks both passed by a series of endorsements back into the bank account upon which they were drawn. Thompson offered an explanation for the method of handling the transaction, which he said was for the purpose of obtaining cash quickly to meet payrolls and pay materialmen, but the explanation does not show that Phœnix parted with anything or that any cash was made available to the bridge company.

The court also found that the issue of bonds for the alleged payments of $10,000 to Industrial Contracting Co. and of $11,262.71 to McClintic-Marshall Co. was fraudulent. Shaffer & Co. owed these items and they were paid by Phœnix. Thompson through his wife caused entries to be made in the bridge company books showing the money to have been advanced to the bridge company by Phœnix. The liability of the bridge company is predicated upon the guaranty contract of November 10, 1930. But in a settlement agreement of August 6, 1931, Shaffer & Co. settled with the bridge company some disputed claims for extras and received from the bridge company 200 shares of stock of the value of $20,000 and securities of the value of $2,475. Shaffer turned over to Thompson & Co., $10,000 in value of the stock, and Thompson & Co. agreed to pay the claims of Industrial Contracting Co. and McClintic-Marshall Co., thereby releasing Shaffer & Co., the debtor. Assuming that the contract of guaranty of November 10, 1930, was valid, the court found that the bridge company was released. Whatever legal validity may be attributed to either contract, the fact remains that Thompson appears all the way through representing both the bridge company and the Phœnix interests, and in every instance to the disadvantage of the bridge company and to the advantage of the Phœnix interests. The finding of the court with respect to these two items must be sustained.

The master found that the bridge company received full consideration for the $9000 paid by Phoenix to Kramer & Hogg for the release of a mechanic's lien, and no consideration for the alleged payment of $461.42. The court disallowed both items, the latter as not established by the evidence

426

and the first on the ground that the plaintiffs were not entitled to any affirmative relief. The court found several items of value chargeable to Phoenix on the ground of fraud which much more than off-set the two items, if valid. Some of these findings abundantly supported by the evidence will be noted. The guaranty contract of November 10, 1930, recites a delivery to Phoenix of 140 shares of bridge company stock of the value of $14,000 in consideration of a guaranty by Phoenix to pay Shaffer & Co.'s obligations to McClintic-Marshall Co. and Industrial Contracting Co. in the event of Shaffer & Co.'s default and an agreement by the bridge company to repay Phoenix any sums which Phoenix might be required to pay on account of the guaranty. Thompson later waived the requirement of the contract that Shaffer & Co. should protect the bridge company with a surety bond. The court held that the contract was fraudulent and that there was no consideration for the $14,000, and that Phoenix is indebted to the bridge company in that amount. Again, on November 5, 1930, Thompson purchased 65 shares of bridge company stock at $100 a share; on December 31st he purchased 170 shares, and A. B. Wilder, a director of the company 10 shares. Later Thompson wrongfully credited Thompson & Company, a subsidiary of Phoenix, on the books of the bridge company with a 15% commission on the sale of this stock in the amount of $3,675. On November 1, 1931, Thompson and his companies turned over to the bridge company, when he was in control of its affairs, worthless notes in the amount of $5,410.85, which had been taken in the sale of their own stock, and took from the bridge company an equal sum in cash. Other charges equally flagrant are found by the court. All of these findings, supported as they are by evidence, justified the court in holding that Phoenix is not entitled to credit for the $9000 and $461.42 items.

The $60,500 of bonds issued in exchange for 517 shares of preferred stock were clearly invalid. Section 19 of the General Corporation Laws of Delaware, Rev. Code 1935, § 2051, forbids a corporation to repurchase its own stock when to do so would impair its capital. It was stipulated that the bridge company had no surplus from which to make the purchase. Further, at that time there were outstanding other shares of preferred stock of the bridge company the holders of which were not given notice nor opportunity to surrender it, as

required by the articles of incorporation of the bridge company. Thompson's explanation of this transaction is that the 517 shares were never sold outright, but that Phoenix took the stock to sell to the public, and advanced money on it to the bridge company; and that the bridge company had agreed to pay such advances with interest. The form of the transaction was otherwise. The bridge company under a contract signed on its behalf by Thompson delivered $10,000 and 3200 shares of its stock to Shaffer & Company in payment for the erection of the superstructure of the bridge. Shaffer & Company sold the stock to Thompson & Company at 70 for a $224,000 note. In selling the stock at 100 Thompson & Company made a profit of 30 per cent. The court was justified in finding that the transaction was what it purported to be instead of accepting Thompson's subsequent explanation. Thompson and Shaffer were both capable business men, advised by competent lawyers; it is reasonable, therefore, to believe that the contract of November 11, 1930, by the terms of which Shaffer & Company agreed to build the superstructure of the bridge correctly expressed the intention of the parties.

The last $20,100 of bonds were issued to Phoenix as collateral to secure a purported indebtedness of $17,735.19. The master disallowed all but $3,125 which was used to pay taxes. This is a just claim, but is more than off-set by the $14,000 and other items referred to above. $9,806.10 of the amount were furnished by Phoenix to pay interest on bonds held by Phoenix, which were known by the officers of Phoenix to be fraudulent. The transaction amounts to no more than a manipulation to obtain more bonds and increase the secured claim against the bridge company. $1505.75 were charged for salaries to Phoenix officers and employees. We find no argument of appellants in defense of this item. The remainder of the claim is for cash items alleged to have been advanced by Phoenix to the bridge company, which, if allowable, are wiped out by the indebtedness of Phoenix to the bridge company.

It is argued with great earnestness by appellants that notwithstanding appearances the bridge cost $815,146.85 of which only $653,659.23 were paid for by outstanding stock, and that the difference of $161,487.62 was furnished by Phoenix; that the bridge company had no other source of income. This would be a formidable argu-

ment except for the fact that the bookkeeping by which the result is reached is set out and it does not bear analysis. The figures are confuted by the facts.

We conclude that the record supports the lower court's findings with respect to lack of consideration for the $177,600 of bonds issued to Phoenix.

Appellants' contention that the issuance of these bonds, was not fraudulent because it was accomplished in the exercise of business judgment by the management of the bridge company, without overreaching, and with the full knowledge and approval of the stockholders, is not sustained by the record. When the bond issue was proposed Thompson was president of the bridge company, as well as the dominant figure in Phoenix and the Thompson Company. The bridge company's books were kept by employees of Phoenix, and it is not denied that Thompson at all times after November 1, 1930, managed the finances of the bridge company. In the December 31, 1931, balance sheet of Phoenix Finance System, Inc., which was prepared under Thompson's direction, the bridge company is listed as a subsidiary. At the March 10, 1931, meeting of the directors, when the $50,00 mortgage was given Phoenix for the "revolving checks," the only directors present were Thompson, V. W. O'Connor, who had been Shaffer's partner and who testified that he relied on Thompson and followed his directions, Wilder, who was a Phoenix director, and Thorson, who was made a director after Thompson took control at Thompson's suggestion. At the meeting of November 10, 1931, when the bond issue was authorized, there were present 9 of the 11 directors, including Thompson, Wilder, English, who was another Phoenix director, M. White, who was Thompson's secretary and an officer in some of his companies, and Thorson. The resolution authorizing the bond issue recited that the corporation was indebted to Phoenix for $50,000 secured by a mortgage, and to McClintic-Marshall for $12,000, to Kramer & Hogg for $13,000, to Phoenix for payments made to Industrial Contracting Co. $10,000, and to other unnamed creditors $40,000. Whether the directors were deceived by Thompson in this connection or whether they knew and acquiesced, they violated their duty to the stockholders in authorizing a bond issue to pay these non-existent obligations. When the management solicited proxies from the stockholders for approval of the bond issue

at the stockholders' meeting of December 22, 1931, similar misrepresentations were made. Consent of the stockholders obtained without disclosure of the circumstances does not excuse or ratify the fraud. Farwell v. Pyle-National Co., 289 Ill. 157, 124 N.E. 449, 10 A.L.R. 363; Gross Iron Ore Co. v. Paulle, 132 Minn. 160, 156 N.W. 268; 14a C.J. 100; 13 Am.Jur., Corporations, § 978.

Appellants also complain of the terms of the decree as it affects bondholders other than Phoenix. The court found that $5000 worth of bonds had been issued in consideration of claims held in that amount; $7400 worth of bonds were issued to Helmer Anderson in consideration of a claim for $6000; and $10,000 worth were issued to a firm of attorneys to secure a $4000 debt. Although the court found that none of these bondholders were holders in due course it concluded that equity should be done them so far as possible without doing greater injustice to the estate. The decree therefore denied foreclosure as to any of the bonds, but provided that the income of the bridge be impounded until the $15,000 of claims, found to be meritorious, should be paid. Appellants assert that in this respect the decree goes beyond the scope of the issues and takes property without due process from persons not parties to this suit. As has already been pointed out the trustees represent all of the bondholders for the purpose of determining whether the trust deed is valid. The pleadings put that issue before the court, and it has now been determined that the trust deed itself is not valid because it is tainted with fraud. The court also found that there had been no showing that any of these bondholders were bona fide purchasers. Stewart v. Lansing, 104 U.S. 505, 26 L.Ed. 866. Iowa Code § 9519. If these findings are correct the decree is proper. Under the circumstances we think there is no room for the trustees to complain of the treatment given these claimants, since their equitable rights are fully protected.

Appellants further suggest in their brief that it is not shown that Phoenix Finance Corporation participated in the fraud, and that it is accordingly entitled to a decree of foreclosure for the bonds held by it. This claim lacks merit. Thompson testified that Phoenix Finance Corporation was organized December 29, 1931, for the purpose of taking over all of the assets of Phoenix Finance System, Inc., and of several other corporations. After the consolidation had been effectu-

ated the officers of Phoenix Finance System, Inc., became the officers of Phoenix Finance Corporation. The new corporation with the same officers was in full control when the board of directors of the bridge company adopted the resolution of July 7, 1933, authorizing the second issue of bonds. The court found also that the new corporation took all the bonds with full notice of the circumstances surrounding their issue, and that it proceeded to adopt and carry on the fraudulent scheme of its predecessor. Since this finding is supported by evidence Phoenix Finance Corporation is in no better position to recover on the bonds than would be Phoenix Finance System, Inc., had the consolidation not been effected.

■ After the decree had been entered the appellants filed a petition for rehearing, and Phoenix prayed in the alternative that the decree be modified (1) by reserving from adjudication the question of the validity of the $50,000 mortgage dated March 10, 1931; (2) by permitting Phoenix to institute an action at law against the bridge company, if it so desires, for money had and received; and (3) by reinvesting in Phoenix the 517 shares of bridge company stock surrendered in exchange for bonds. The court overruled the petition both for rehearing and for modification of the decree. The petition for rehearing was properly denied. The granting of a rehearing is within the court's sound discretion, and a refusal to entertain a petition therefor, or the refusal of the petition, if entertained, is not the subject of appeal. Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 137, 57 S.Ct. 382, 385, 81 L.Ed. 557; United States v. Benz, 282 U.S. 304, 51 S.Ct. 113, 75 L.Ed. 354; United States v. Mayer, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129; Zimmern v. United States, 298 U.S. 167, 56 S.Ct. 706, 80 L.Ed. 1118; Aspen Mining & Smelting Co. v. Billings, 150 U.S. 31, 36, 14 S.Ct. 4, 37 L.Ed. 986; Roemer v. Bernheim, 132 U.S. 103, 10 S.Ct. 12, 33 L.Ed. 277; Liebing v. Matthews, 8 Cir., 216 F. 1.

■ The petition for modification of the decree was also properly refused. The request to withhold from adjudication the question of the validity of the $50,000 mortgage and to permit Phoenix to sue for money had and received are plainly without merit. These questions were within the issues properly decided in the decree. In refusing to modify the decree to require the bridge company to return to Phoenix the 517 shares of stock surrendered in exchange for bonds the court invoked the maxim that "He who hath done iniquity shall not have equity." This "clean hands doctrine" is subject to the familiar limitation that a plaintiff is not barred from relief in a court of equity unless his wrong has an immediate and necessary relation to the equity for the enforcement of which he prays. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Talbot v. Independent Order of Owls, 8 Cir., 220 F. 660; Olsness v. Home Ins. Co., 8 Cir., 14 F.2d 907; Trice v. Comstock, 8 Cir., 121 F. 620, 61 L.R.A. 176; Primeau v. Granfield, 2 Cir., 193 F. 911. In the present case the district court adopted the view that all of the transactions leading up to the issuance of the bonds were steps in a single fraudulent enterprise to obtain ownership of the bridge after a foreclosure. We are not disposed to hold that this view of the lower court is wrong; and therefore we cannot say that appellants are entitled to have relief in equity in respect to any part of the fraudulent enterprise. It may be added that the record does not compel the inference that there was no fraud in the original issuance and transfer to Phoenix of the 517 shares of stock.

■ Having determined that the appellants had no standing to maintain their suit, the district court had neither the right nor the duty to compel the bridge company to restore what it had received from the bondholders. This is not a case in which the defrauded party is suing to rescind. Here the fraud has been pleaded only as a defense. Where the defrauded party is suing to rescind he must "do equity" by restoring whatever he received from the wrongdoer; but when the wrongdoer as plaintiff is attempting to enforce the tainted contract he is turned out of court empty handed. Columbus v. Mercantile Trust Co., 218 U.S. 645, 662, 31 S.Ct. 105, 54 L.Ed. 1193. Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 450, 55 S.Ct. 444, 447, 79 L.Ed. 982; Mortgage Securities Corp. v. Levy, 5 Cir., 11 F.2d 270; Connecticut General Life Ins. Co. v. Benedict, 2 Cir., 88 F.2d 436; Pomeroy, Equity Jurisprudence, § 386; of Farrington v. Stucky, 8 Cir., 165 F. 325. In Columbus v. Mercantile Trust Co., supra, where the plaintiff was seeking an injunc-

tion, the district court held that the plaintiff was not entitled to such an injunction, but found that the defendant had been guilty of certain inequitable conduct, and entered a decree requiring the defendant to do equity as a condition for dismissing the plaintiff's bill. The Supreme Court reversed, saying (page 110): "The court justified the imposition of conditions under the maxim that he who seeks equity must do equity. But this maxim is one which applies to him. who affirmatively seeks equitable relief. * * * Manifestly the maxim cannot vest in the chancellor the power which has been exercised. It is true that the city by a cross bill asked to have the contract declared at an end for nonperformance. But this was defensive relief."

Under these long established principles of equity and the pleadings and proof in this cause the court did not err in refusing to modify the decree as requested by appellants by granting to complainants affirmative relief against the defendant.

For the foregoing reasons the decree of the district court is affirmed.