**READINGER v. RORICK et al.** *
No. 7419.

Circuit Court of Appeals, Sixth Circuit.
June 28, 1937.

Rehearing Denied Oct. 8, 1937.

*Writ of certiorari denied 58 S.Ct. 364, 82 L.Ed. —.

George D. Welles, of Toledo, Ohio (Welles, Kelsey & Cobourn, of Toledo, Ohio, Edmonds, Obermayer & Rebmann, of Philadelphia, Pa., Earl F. Boxell, of Toledo, Ohio, David F. Maxwell, of Philadelphia, Pa., and A. Gilmore Flues, of Toledo, Ohio, on the brief), for appellant.

Harold W. Fraser and R. B. Swartzbaugh, both of Toledo, Ohio (Fraser, Effler, Shumaker & Winn, of Toledo, Ohio, on the brief), for appellees.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

HICKS, Circuit Judge.

This suit was instituted as an action at law by John L. Huye against certain members of the partnership of Spitzer, Rorick & Co., dealers in securities, to recover a judgment for $115,405.61, the purchase price paid by Huye to the partnership for bonds of Acquisition and Improvement District No. 38 of San Diego county, Cal., in the face amount of $100,000 and interest.

After the hearing Huye died and the cause was revived in this court in the name of his administrator, Albert S. Readinger.

Huye based his right to recover upon a unilateral rescission of the purchase and a purported tender of the bonds both before and at the trial, claiming false representations and concealment of facts inducing him to make the purchase.

The parties will be referred to herein as plaintiff and defendants.

The court on motion of defendants transferred the case to the equity side; and found for the defendants.

Plaintiff, a retired business man, lived in Reading, Pa. Prior to the transactions involved, Arthur C. Dyer, a salesman of the company and one of its partners, had made it a habit to spend Tuesday night of each week at the Mansion House in Reading and as regularly as he stopped there plaintiff would have himself driven to the hotel and spend the evening in Dyer's room discussing the stock and bond markets with him.

On Tuesday, April 2, 1929, Dyer reached the hotel about 7 p. m. and plaintiff was waiting for him. Plaintiff, who had bought bonds from Dyer on previous occasions, opened the conversation by saying, "What is new, what is new?" Just a few days earlier Dyer had received a circular from his company about the issue of bonds sued on here. In response to plaintiff's inquiry Dyer produced the circular and read most of it to him. Plaintiff testified that Dyer said, "Anything I sell you is one hundred cents on the dollar or the money back," and that the bonds were as good as government bonds. Dyer testified that he did not explain the clauses in the circular since he knew nothing of the bonds other than what was contained therein; that plaintiff said he had $100,000 to invest and inquired of him if he thought the bonds were any good. Dyer testified that he replied that he did, saying that his company investigated all bonds it offered before buying them, and that its record on municipal bonds was good.

Present at this conversation was William K. Dungan, a distributor of the defendants who had been working under Dyer's direction for thirty years. He corroborated Dyer's testimony in most particulars. Both denied plaintiff's claim that Dyer stated that the issue was as good as government bonds. Dungan testified that plaintiff was given a copy of the circular and glanced at it when Dyer was reading it but did not read it himself. Plaintiff carried away at least one and probably more copies of the circular.

Dyer stated that he knew plaintiff had a high regard for his judgment and that he continually urged plaintiff to get out of the market while it was strong and invest part of his money in high grade (low yield) bonds; that he urged plaintiff again that evening to take only $50,000 of the California bonds but that it seemed to have been plaintiff's own idea to buy $100,000 of them and have Dyer call up Mr. Wehage, New York representative of the partnership, after which plaintiff talked to Wehage and placed his order, which was confirmed the next morning.

Dyer testified that if he spoke of government bonds it was not for the purpose of comparing them with the A. and I. D. No. 38 bonds but as a part of his urging plaintiff to invest some of his money in high grade bonds, which he considered government bonds to be. But even if he did compare the bonds with United States government bonds, plaintiff, in what was admitted by counsel to be about his only coherent testimony, reiterated that he did not believe the bonds were better than United States government's, otherwise Dyer would not have offered them.

Mrs. Huye testified that she was present at the discussion between Dyer and plaintiff; that Dyer stated that the bonds were as good or better than United States government bonds, that they were gilt-edged, and that plaintiff could not buy anything better.

Dyer not only denied that he made such a statement but testified that Mrs. Huye was not even present when the conversation took place, and, to us, her testimony was so vague and generalized as to negative any conclusion that she was there. On cross-examination, she refused to commit herself positively that she was present that night. Dungan does not mention her presence.

At the time plaintiff gave his testimony, he was unfortunately, suffering from aphasia, and his answers were generally so irresponsive and unsatisfactory as to be of almost no value. His condition was pitiable, but did not excuse him from presenting the requisite quantum of proof.

We do not find that the sale was based upon the personal statements of Dyer misleading in nature. The proof does not so establish by clear and convincing evidence which the law requires. Blakeslee v. Wallace, 45 F.(2d) 347, 350 (C.C.A.6).

On the question of whether confidential relationship existed between Dyer and plaintiff, it must be kept in mind that while Dyer was a bond salesman, plaintiff was a successful trader. He always brought up the question of markets, and their discussion seems to have sprung from the fact that plaintiff had an avid interest in the subject. On his trips to the hotel plaintiff usually made an evening of it, and the inference is that he found it a congenial way to spend a little time, discussing a favorite subject. It is true that Dyer made an occasional sale of bonds to him but over a period of nine prior years he sold plaintiff bonds on five or six occasions only and in amounts averaging about $25,000 per sale. The evidence of a confidential relationship is not convincing.

Plaintiff was an elderly man with failing eyesight. He was usually driven to the hotel by his wife or chauffeur and was picked up again at the end of the evening. The extent of his defective vision is not clear. Dyer thought he could read with reasonable facility. Dungan knew that he was contemplating an operation but said that plaintiff could read things by holding them close. Plaintiff's wife testified that he could not read and that Dyer often read things to him. Others testified that he read with great difficulty. His surgeon testified that plaintiff had a cataract and that he performed a preliminary operation for its removal on May 23, 1929. He did not say that plaintiff could not read early in 1929, but stated that he could not read with facility and ease. However, the point seems immaterial, since plaintiff carried away a copy or copies of the circular and could have had it read to him, if he wished.

The bonds were delivered about two months later, June 5, and Dyer testified that he met plaintiff at the National Union Bank of Reading, where he filled out a counter check for plaintiff for $103,811.11, the purchase price with interest, which plaintiff signed. This is in conflict with the testimony of Maurer, who was admittedly trying to sell plaintiff other bonds, that the check was made out by plaintiff and transferred in Dyer's room on the evening of June 2 or 3, and that before it passed Dyer praised the bonds. We do not think the incident important, although we are disposed to accept Dyer's version, as the check is dated June 5. Plaintiff then made no complaint. Moreover, Dyer testified without contradiction that "Sometimes after he"

(plaintiff) "ordered bonds he said he would rather not have them and I cancelled the order."

This brings us to the circular. It contained four pages. The first page was a kind of title page. At the top was a line—"Exempt from all Federal Income Tax." In the center was the following:

"$292,715.60.

"San Diego County California
7%
Acquisition and Improvement
District No. 38
Gold Bonds."

At the bottom was the name, "Spitzer, Rorick & Company" and beneath a legend that it was established in 1871, and its New York and Toledo addresses. The back or fourth page bore a map of San Diego and vicinity. A. and I. District No. 38 was designated thereon by a circle. Pages 2 and 3 contained the statements in question. Before considering them, we set down a few undisputed facts as to the Improvement District.

It is located about nine miles east of the business center of San Diego and about two miles south of La Mesa, with a population of about 3,500 people, including some very fine homes. Paved roads led to San Diego and La Mesa. There were a few other gravel roads in the vicinity. The district consisted of 1,257 acres, partly valley land and partly ridge land. The valley land was better and suitable for farming and the lower slopes for horticulture. The ridge land was thin but it overlooked the sea at a distance and carried a view of the mountains and seemed chiefly desirable for residential purposes.

At the time of the bond issue the district was sparsely settled, having about twenty-five houses, most of them of cheap construction. There were a few small farms and orchards. It is not clear whether this lack of development was due solely to the absence of water, but it is certain that there could be no successful development without water. The proposed improvement, according to the report of G. I. Gilbert, a lawyer with experience in bond investigation, who spent more than two months investigating the project for defendants, consisted of opening and paving the roads through the tract and installing distributory water mains to all parts of the tract except a high point in Zone D. The cost of the improvement was to be divided equally between paving and water mains.

The improvement was authorized by resolution of the board of supervisors of the county of San Diego, October 17, 1927. The contract with the Hazard Construction Company was entered into in December, 1927, and the work was required to be completed by December 31, 1928. The bonds were signed by the treasurer of the county of San Diego on November 19, 1928, in the total amount of $292,715.60, and were issued to the contractor. Gilbert investigated this issue early in 1928; Spitzer, Rorick & Co. contracted to buy them in May and they were paid for on December 20, 1928, at the rate of 85 cents on the dollar. They were billed to the salesman at 96 and were sold to the plaintiff at 100 plus interest.

On the second page of the circular is the "Financial Statement" which fixed the "Appraised Value of Lands in District" at $803,996, and the "Total Bonded Debt of District" at $295,000.

Plaintiff attacked both figures. The figure of $803,996 was that of T. H. King, an engineer of San Diego county who had been in charge of nearby irrigation improvements. He was a man of the highest reputation and in a position to know land values. The report was first made to Hazard, a prospective bidder. His figures were based on the tax rolls of the lots in A. &. I. D. No. 38, which in 1927 totaled $251,988. By an apparently arbitrary set-up, justified somewhat by the improvements being made, he first appraised the value of land in the district at just twice the 1927 assessment, and later, apparently in view of other potential improvements, jumped the figures to $803,996. We note that the Tax Factors, Inc., a private corporation which did much of the evaluation work upon which the tax rolls were based, made a reappraisal of the district in 1928, and 1929, after the improvements were in and reached a valuation of only $267,495. If these figures are to be taken at their face value, then it appears that the appraisal figures in the circular were distorted. On the other hand, it is unlikely that the responsible county body which authorized the improvement would have done so if the Tax Factors, Inc., figures were accurate.

The evidence shows and it is common knowledge that often there is a marked discrepancy between assessed and real land values. Plaintiff introduced witnesses who testified that the real value was far below the appraised value stated in the circu-

lar; while defendants introduced other witnesses who testified that in 1928, the average value was from $600 to $900 an acre. Assuming that all the witnesses were competent and unimpeachable, we must not forget that testimony as to land values is after all an expression of opinion only. Byers v. Federal Land Co., 3 F.(2d) 9, 11 (C.C.A.8), and cases there cited. There is no mathematical formula by which such values may be determined.

With reference to the statement "Total Bonded Indebtedness of District, $295,000.-00" this figure is literally true as applied to the district as a unit, but it is not true that this was the maximum bonded debt actually chargeable to lands within the district. This involves overlapping issues.

District No. 38 was included within the La Mesa Lemon Grove and Spring Valley Irrigation District of 18,000 acres against which there were outstanding $2,-057,000 of bonds. On a proportional acreage basis this would charge District No. 38 with over $130,000 more of bonded indebtedness. There was a further large overlap in Zone E and A from A. and I. D. No. 25. Thus it seems that the actual bonded indebtedness chargeable to land lying in the district was far in excess of the $295,000 figure appearing in the circular. But Rorick, one of defendants, testified that he had seen scores of circulars and had never seen a reference to overlaps. It does not seem to be customary to make reference to them in such circulars.

Admittedly the statement in the circular that San Diego county was "entirely free from frost" was wrong, but we do not regard it as material because while the district sometimes had a little frost in low places, it had no killing frosts.

The circular contains the following statements: "Furthermore, if necessary, the County is authorized by law to pay bonds or coupons out of the General Fund of the County" and "The law has been passed upon by the Supreme Court of California and fully approved." Both of these statements seem to be literally true. Bonds were issued under the authority of a statute of California called the "Acquisition and Improvement Act of 1925" (St.Cal.1925, p. 849) or the "Mattoon Act" and the circular so discloses. This act did have the approval of the Supreme Court in County of Los Angeles v. Hunt, 198 Cal. 753, 247 P. 897. See, also, City of Pasadena v. McAllaster, 204 Cal. 267, 267 P. 873.

There is a provision in the act (section 41, subsec. 7, as amended by St.Cal.1931, p. 1554) that whenever there shall not be sufficient money in the interest and sinking fund to pay the principal or interest on the bonds, the payments may be made out of moneys transferred from the general fund of the county. We do not regard the failure of the circular to set out this section of the act in full or to particularly point out the decisions of the Supreme Court of Californa dealing therewith as a fraudulent failure to disclose. The act and the decisions were equally available to both parties. See Slaughter's Administrator v. Gerson, 13 Wall. 379, 383, 20 L.Ed. 627. To require them to be set out within the limits of a circular is beyond reasonable expectation. See Mandelbaum v. Goodyear Tire & Rubber Co., 6 F.(2d) 818 (C.C.A.8).

Plaintiff attacks the following clause in the circular as a fraudulent misrepresentation, to wit: "We recommend these bonds as being very well secured investments, yielding an exceedingly high tax free return." We consider this statement in connection with what is called the "hedge clause" in the circular, to wit: "The statements contained in this circular are based upon official and other information which we consider reliable but are not to be considered as representations or guarantees by us." Aside from the hedge clause, the record is singularly devoid of evidence that plaintiff really relied on anything appearing in the circular. It is true that he said he bought from the circular but his remarks were so rambling that we can give them little credence. What seems more likely is that he relied upon the reputation of Spitzer, Rorick & Co. and its judgment that the bonds were good. In view of the hedge clause, we think that it was the honesty of their judgment which is really brought into question.

With reference to a somewhat similar clause, it was held in Saupe v. St. Paul Trust Co., 170 Minn. 366, 212 N.W. 892, 893, that "as a general rule, one who qualifies his representations by the use of language indicating that they are based on information and belief, and who honestly believes the representations to be true, is not guilty of actionable fraud, although in fact they proved to be untrue." See, also, Southern Development Co. v. Silva, 125 U.S. 247,

8 S.Ct. 881, 31 L.Ed. 678. The evidence shows that this clause embraced no idle or reckless statement. It does not show by that clear, unequivocal, and convincing proof which is requisite (Maxwell Land-Grant Case, 121 U.S. 325, 381, 7 S.Ct. 1015, 30 L.Ed. 949) that defendants believed it was untrue.

Gilbert was a lawyer and an investigator working under a five-year contract with the partnership. He first learned of the bond issue when he was in California investigating the Mattoon Act. He was in communication with the home office and on March 27, 1928, sent them a lengthy report about A. and I. D. No. 38. He said very frankly therein that he first thought the issue undesirable (this, incidentally, was Horton C. Rorick's reaction) but Gilbert consulted with King, with Hazard, with members of the well-reputed engineering firm of Watson, Valle & Gough, and with members of the real estate firm of Grable, Francisco & Bleifus, who believed in the district enough that they were buying up parts of it for resale. He also consulted the law firm of Crouch & Sanders, specialists in this type of bond issue, about their legality.

Easton, a member of the firm and in the buying department, spent considerable time in California early in 1928, investigating the Mattoon Act. He became acquainted with a number of the men whom Gilbert consulted. He was first of the opinion that the district might be out of the line of growth, but was convinced after a study of voluminous materials on the country around San Diego that it was a good buy and that it had not developed because of the absence of water and improvements. He testified that he went over a mass of miscellaneous information about San Diego, including maps, booklets, and other literature. This disclosed to him that San Diego and its environs were rapidly developing. As an illustration, the bank debits in 1916, were $112,000,000 as compared with $840,000,000 in 1919.

On April 16, 1928, Rorick talked over the issue with Easton and on the showing then made was not interested but on May 8, after Gilbert's return, he went over the matter with both men and after finding that the bonds were still available, the three spent two days going over the "entire Southern California situation, including San Diego County, and especially District No. 38, the Mattoon Act, the values of the District, and the growth of the city upon which the future of the District depended" before they decided to buy the bonds. They believed in the bonds to the extent that they put their own money ($248,808.-26) into them two or three months before they made any attempt to sell them. The company had been in business sixty years and bore an enviable reputation for the soundness of its issues. Its future success depended upon its integrity. Under normal conditions the evidence of overappraisal would be impressive. But the stock market crash of 1929, and the financial depression had intervened. The appraisals were made in the light of business conditions and the general optimism of 1928. The depression brought on a general stagnation of business activity, and the District Judge, with sound reason, concluded that it and not any fraudulent bloating in values accounted for the decline in the value of the bonds. This court has previously taken judicial note of the depression. Wolfes v. Paragon Refining Co. (C.C.A.) 74 F.(2d) 193; see, also, Mandelbaum v. Goodyear Tire & Rubber Co., supra. Furthermore, we attach no special significance to the fact that the partnership discharged Gilbert after the bonds had defaulted. Such a default was so unusual that it was convinced it was due to Gilbert's incompetence, but after witnessing the subsequent default of hundreds of other issues on account of the depression, Rorick stated with candor that they had misjudged Gilbert.

There appears nothing sinister in the purchase of the bonds at 85. Four points of this went to the salesmen. The company would make a nice profit, but it must be remembered that it spent large sums on investigations of issues, many of which it never purchased.

■ The District Court did not err in transferring the case to the equity side.

In May, 1930, plaintiff delivered the bonds to the Franklin Trust Company, Philadelphia, as collateral. A receiver was appointed for the Trust Company May 15, 1933, at which time the bonds were still in its possession as the legal holder. On June 7, 1934, the court of common pleas No. 5 of Philadelphia county, which was supervising the receivership of the Trust Company, entered an order authorizing the liquidator of the Trust Company to place the bonds in the custody of Mr. David S. Maxwell as "Special Attorney in Fact for the Receiver." Mr. Maxwell

146

was also counsel for plaintiff and the purpose of the order was to permit the bonds to be offered as a tender in the present suit. But the order provided that the bonds were to be returned upon the completion of the trial; or in the event the tender should be accepted, then such sum of money was to be paid to the receiver as should be approved by the Philadelphia court. The plaintiff undertook to make the tender but could not because he could not put the defendants in statu quo. He owned the equitable title only; he could not restore the bonds to the defendants free and clear. See Pomeroy's Eq.Jurispr. (4th Ed.) vol. 5, § 2110; also vol. I, § 110. He therefore had no plain, adequate, and complete remedy at law. In such situation his rights, if any he had, could be adjusted only in equity.

Plaintiff undertook to remedy this situation by procuring a supplemental order from the Philadelphia court to redeliver the bonds to Mr. Maxwell, for the purpose of enabling plaintiff to keep good his tender. We will not discuss this order further than to say that it was ineffective for two reasons: (1) It did not reinvest plaintiff with the unclouded legal title to the bonds; and (2) it came after the trial and was then too late.

The decree is affirmed.