### STORLEY et al. v. ARMOUR & CO.
### No. 11460.

Circuit Court of Appeals, Eighth Circuit.
Nov. 10, 1939.

E. T. Conmy, of Fargo, N. D. (G. T. Westlund, of Fargo, N. D., on the brief), for appellants.

Howard G. Fuller, of Fargo, N. D. (Fuller & Powers, of Fargo, N. D., and Walter C. Kirk and John A. McKee, both of Chicago, Ill., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

Fifty-eight plaintiffs, in a class suit brought to enjoin Armour & Company from polluting the Sheyenne River with the effluent from its packing plant situated in the village of West Fargo, North Dakota, and for damages resulting to the plaintiffs from such pollution, have appealed from a decree directing the entry of fifty judgments in their favor, upon the ground that the awards made by the court were less than the law required.

The Sheyenne River is a small river which rises in the central part of North Dakota and is approximately 250 miles long. After flowing east and south through Valley City and Lisbon, it flows east and north through West Fargo and thence north by northeast to its junction with the Red River of the North at a point about 16 miles from West Fargo. Between West Fargo and the mouth of the Sheyenne there are seventy farms of varying sizes bordering the river. In 1919 the Equity Cooperative Packing Association built a packing plant in West Fargo on the east bank of the river. This plant was operated for about three years and then lay idle until 1925, when it was acquired by Armour & Company, which has ever since been operating it. A pool created by a dam in the river above the plant furnished the necessary supply of water for the plant. The river, below the plant, furnished the only means for the disposal of plant waste and sewage from the plant and the village. The effect of the operation of the plant was to turn the river below the plant into an open sewer. The water became not only unfit for all domestic purposes, but unwholesome for cattle to drink. The river became useless for bathing, boating, fishing or swimming and for the taking of ice, and during the summer months became a breeding place for flies. Instead of being a benefit to those who occupied the farms along its banks, it became a detriment and a source of discomfort to them because of putrefying matter and filth which gave off noxious odors. Protests against the defilement of the river were made by those affected as early as 1926, but conditions were not remedied.

In 1934 John Storley and thirty-one others who owned and occupied farms bordering the river below the plant brought separate suits in the State Court of Cass County, North Dakota, for injunctions against the pollution of the river by Armour & Company and for damages. These 32 suits were removed to the District Court of the United States. Thereafter all of the plaintiffs except Storley amended their complaints by eliminating prayers for equitable relief. All of the suits where the damages prayed did not exceed $3,000 were remanded to the State Court. Those in which the prayer was for damages in excess of $3,000 were retained. In 1935 Armour & Company settled with the 32 plaintiffs for all damages which had accrued up to January 1, 1936, for the sum of $26,500, which gave to each of the 32 plaintiffs less than one hundred dollars per year as damages. The 32 cases were then dismissed, with the exception of the Storley suit, and it was agreed that that suit should be continued as a class suit until November 1, 1935; that in the meantime Armour & Company should install "facilities for primary treatment by screening and settling of packing house waste"; that if, after November 1, 1935, it was still believed that unlawful pollution of the river existed, the

Storley suit might be brought on for trial, but that all damages accruing to Storley up to January 1, 1936, had been paid and that that issue was eliminated from his complaint. In October, 1936, the Storley suit was set for trial on December 8, 1936. By stipulation, the other plaintiffs here claiming damages due to the pollution of the river were joined with Storley. In January, 1937, the District Court entered an interlocutory decree to the effect that the nuisance created by the pollution of the river still existed; that the entry of a final decree enjoining Armour & Company from polluting the river should be stayed for a year in order to enable it to find some additional means of treating the waste from the plant so as to abate the nuisance; and that jurisdiction to assess damages should be retained. See Armour & Co. v. Miller, 8 Cir., 91 F.2d 521, 525. In January, 1938, testimony was taken relative to damages claimed to have been suffered by those who owned or occupied 50 farms bordering the river below the plant. The testimony as to damages was not taken before the court, but was, by order of the court and consent of the parties, taken by the court reporter as a special examiner, and reported to the court. After the transcript had been prepared by the reporter, counsel for the plaintiffs prepared and filed itemized statements of the damages claimed by each of the plaintiffs.[1] The case, as to damages, was submitted to the court upon the evidence adduced before the court reporter, the statements of their claims filed by the plaintiffs, and briefs and arguments of counsel. With few exceptions, the damages to be determined were those accruing between January 1, 1936, and January 1, 1938.

After the submission of the case and on September 28, 1938, the court filed an opinion ruling that certain items of damages claimed were disallowed: (1) Damages claimed because of the unfitness of the river water for drinking and culinary purposes; because the river water had not been fit for such purposes prior to the existence of the nuisance. (2) Damages claimed for loss of cattle due to Bang's disease; for the reason that the evidence that the pollution of the river was the proximate cause thereof was speculative. (3) Damages claimed for the death of turkeys; because the evidence was speculative. (4) Exemplary damages; for the reason that the court was satisfied that exemplary damages should not be allowed. (5) Damages claimed to "feeders"; because no suitable foundation in the evidence to form an estimate of the amount of damage existed. (6) Damages claimed for loss of calves; because the evidence was speculative. (7) Damages claimed to "milkers"; because the evidence was insufficient to form any basis for an estimate of damages except as to one plaintiff.

In the opinion the court further ruled that landlords out of possession were entitled to recover for diminution of the rental value of their lands caused by the condition

---

[1] A typical statement of claim follows: "Stephen H. Hoag—aged 60. (Settled with to Jan. 1, 1936.)

Damages for interference with comfortable living by stench and flies ................. $2400.00

Damages for hauling water in 1936, 1 hour a day for 2 weeks, 14 days, at 60¢ an hour, 8.40

Damages for hauling water in 1937, 1 hour a day for 8 weeks, 56 days at 60¢ an hour, 33.60

Damages for pumping water in 1936, 2 hours a day (except for 2 weeks) 351 days at 60¢ an hour, ................. 421.20

Damages for pumping water in 1937, 1½ hours a day (except for 8 weeks), 309 days at 60¢ an hour, ............ 370.80

Damages for washing milkers from July 1st to September 15th each year, 150 days, 1 hour a day at 60¢ an hour,.. 90.00

Damages for treating sore udders from July 1st to September 15th, each year, 150 days, ½ hour a day, at 60¢ an hour, 45.00

Damages for loss of privilege of taking ice, 40 tons of ice a year for 2 years at $3.25 a ton, ...................... 260.00

Damages for expense of fly poison, $5 a year for 2 years,.. 10.00

Damages for loss of swimming, boating and fishing privilege, $150 a year for 2 years,.... 300.00

Exemplary damages (This plaintiff in the settlement got $828 damages, one-thirty-second (1/32) of $26,500, for 7½ years of pollution from July 6, 1928, to Jan. 1, 1936, or an average of $100 plus a year.) at $..... a year for 7½ years,.......$......

Damages for loss due to Bang's disease of 29 Guernseys worth $100 apiece, sold for $47.50 apiece, .................... 1522.50"

of the river; that tenants in possession were entitled to recover actual damages proved; that damages for the following items were allowed: (1) Interference with comfortable living; (2) pumping water for stock; (3) time spent washing stock; (4) loss of swimming, boating and fishing privileges; (5) loss of ice-taking privilege; (6) expense of fly spray and poison. The court attached to its opinion itemized statements of the amounts allowed to each of the plaintiffs as damages.[2] The plaintiffs filed a petition for rehearing. On October 17, 1938, the court supplemented its original opinion, making some additions to the allowances made to some of the plaintiffs. On November 28, 1938, a further supplemental opinion was filed, making certain additional allowances. The petition for rehearing was denied. On December 8, 1938, formal findings of fact and declarations of law and a decree were filed, which specified the aggregate amount of the judgment to which each of the plaintiffs was found to be entitled.

■ Twenty-six of the plaintiffs accepted the awards made them by the court. Their judgments were paid and satisfied. Nevertheless they joined in this appeal. They have no standing in this Court. The judgments in their favor were for all damages to which the court determined they were entitled for the period in question. "Accepting the fruits of a judgment and thereafter appealing therefrom are totally inconsistent positions, and the election to pursue one course is deemed an abandonment of the other." Kaiser v. Standard Oil Co., 5 Cir., 89 F.2d 58, 59; Altman v. Shopping Center Bldg. Co., 8 Cir., 82 F.2d 521, 527, and cases cited. Whether the judgments awarded these twenty-six plaintiffs, and which they satisfied, were right or wrong can now be of no concern to this Court. This eliminates from consideration the claim of Edwin Waa and Theodore Waa.

The broad question which the trial court was obliged to determine was, what amount of money would reasonably compensate each of the plaintiffs for the losses caused him by the unlawful pollution of the Sheyenne River by the defendant, Armour & Company, considering the nature, extent and duration of such losses.

■ While the unlawful pollution was conceded, the burden of proving the nature and extent of the damages suffered by each of the plaintiffs was upon him. The controlling law is that of North Dakota. The theory of the District Court, acquiesced in by the plaintiffs and not seriously controverted by the defendant, was that, under the law of that State, the measure of damages where the riparian lands affected were leased was diminution of rental value, and where they were occupied the damages were "actual damages" proximately caused by the pollution. We think there is much force in the defendant's contention that the proper measure of damages would be the diminution in rental value of leased lands, and diminution in the use value of those farms which were occupied, caused by the unlawful pollution of the river. It would seem that the difference between the fair rental or use value of a farm upon the river with the defendant making only such use of the river as it might lawfully make and its fair rental value in the condition resulting from the defendant's unlawful use during the period in question, should constitute a fair and proper measure of the general damages suffered by the owners or occupants of all of these farms. Such a measure would naturally embrace all such items of damages as persons negotiating a lease might reasonably take into consideration in arriving at a fair rental value for any particular farm, which would necessarily include interference with comfortable living due to odors, inability to use the river for a water supply or for swimming, fishing, boating or for ice, increase in the number of flies, and every-

---

[2] A typical example is the following:
"Stephen Hoag, (settled with to January 1, 1936.)

| | |
|---|---|
| Damages for interference with comfortable living, $150.00 per year for 2 years | $ 300.00 |
| Damages for pumping water for stock one year, 1936, | 50.00 |
| Damages for pumping water for stock, one year, 1937, | 50.00 |
| Damages for washing milkers, 150 days one hour a day at fifteen cents per hour, | 22.50 |
| Damages for loss of ice-taking privilege, two years at $20.00 per year, | 40.00 |
| Damages for expense of fly poison, etc., $2.00 per year for two years, | 4.00 |
| Damages for loss of swimming, boating and fishing privilege, 2 years at $25.00 per year, | 50.00 |
| | $ 516.50 |

thing else which would obviously affect the value of a farm for the highest and best use for which it would normally be available.[3] However, the defendant has taken no cross-appeal. The appellants put in their evidence upon the theory adopted by the trial court, and there is no certainty that the law of North Dakota required that diminution of rental or use value be taken as the sole measure for ascertaining general damages.[4] The question, so far as we are concerned, is of academic importance only, except as to the claim of Frithjof Selberg hereinafter referred to.

While the case was pleaded and tried and has been appealed with some considerable lack of formality, the questions which the plaintiffs seek to present are sufficiently clear and understandable.

### Claimed Unfitness of River Water for Domestic Purposes.

■ The court below found that "the river water prior to the creation of the nuisance was not fit for drinking or culinary purposes." This finding is challenged by the plaintiffs. The evidence of the plaintiffs tended to show that, prior to the time the packing plant was first operated —which was before its acquisition by the defendant—some of the riparian owners used river water for drinking and culinary purposes without injury; that some of them made such use of it after the plant first shut down; and that the river water above the plant was safe for such purposes. The evidence of the defendant tended to show that the river was not fit for such uses above the dam nor below the dam prior to the taking over of the plant by the defendant; that the river above the dam had been used by some farmers for sewage disposal; that dead animals had been seen in it at times; that it drained farms and farm yards and contained bacteria which, without the presence of packing house waste, rendered it unfit for use by human beings. It is unnecessary to set out the evidence in detail, since it is elementary that a finding by a trier of the facts based upon conflicting evidence will not be disturbed by an appellate court. H. H. Cross Co. v. Simmons, 8 Cir., 96 F.2d 482, 486; Crowell v. Baker Oil Tools, 9 Cir., 99 F.2d 574, 577. There was virtually no evidence which would have justified a finding that if the river had been subjected to such use as the village of West Fargo and the defendant were lawfully privileged to make of it, the water below the plant would have been fit for drinking or culinary use.

### Claim for Loss of Cattle Through Bang's Disease.

■ The court made no allowance for loss of cattle due to Bang's disease. It is contended, on behalf of one of the plaintiffs, Stephen H. Hoag, that the evidence required such an allowance to him.

The evidence of this plaintiff was that in 1936 he had a herd of Guernseys which had been tested in 1934 and 1935 for Bang's disease with negative results; that the herd was not permitted to run with other cattle; that in May, 1936, the herd was found to be infected; that some of the cattle were condemned and all were sold; that in the spring of 1936 the defendant killed cattle in its plant which were infected with Bang's disease; that infection could have been carried in the waste from these cattle down the stream; and that Hoag's cattle, which had access to the river, could have been infected through drink the water. Dr. Nelson, an expert for the plaintiffs, testified that if the waste from the slaughtered

---

[3] Sussex Land & Live Stock Co. v. Midwest Refining Co., 8 Cir., 294 F. 597, 34 A.L.R. 249; City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 8 Cir., 61 F.2d 210; Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840; City of Norwood v. Sheen, 126 Ohio St. 482, 186 N.E. 102, 87 A.L.R. 1375, and cases cited; Baltimore & Potomac R. Co. v. Fifth Baptist Church, 108 U.S. 317, 327, 2 S.Ct. 719, 27 L.Ed. 739; Oklahoma City v. Tyetenicz, 175 Okl. 228, 52 P. 2d 849; Oklahoma City v. Dyer, 177 Okl. 620, 61 P.2d 660; Johnston v. Galva, 316 Ill. 598, 147 N.E. 453, 38 A. L.R. 1384, and cases cited; Waldron v. Page, 191 Minn. 302, 253 N.W. 894; Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N.W. 484, L.R.A.1918C, 391, Ann.Cas.1918E, 481; Vogt v. City of Grinnell, 123 Iowa 332, 98 N.W. 782; City of Ottumwa v. Nicholson, 161 Iowa 473, 143 N.W. 439, L.R.A.1916E, 983; Stovern v. Town of Calmar, 204 Iowa 983, 216 N.W. 112; Quinn v. Chicago, M. & St. P. R. Co., 23 S.D. 126, 120 N.W. 884, 22 L.R.A.,N.S., 789; City of Madisonville v. Nisbit, 239 Ky. 366, 39 S.W.2d 690; 8 R.C.L. 483; 20 R.C.L. 470; 27 R.C.L. 1122; 15 Am.Jur. 519.

[4] McDonough v. Russell-Miller Milling Co., 38 N.D. 465, 165 N.W. 504; and Id., 47 N.D. 237, 182 N.W. 251; Olson v. Armour & Co., 68 N.D. 272, 280 N.W. 200.

cattle afflicted with Bang's disease had been deposited by the defendant in the river in the usual way, small bits of the intestinal tracts which carry the bacteria of the disease would float down the stream, and that the bacteria might live for eight or ten days and perhaps as long as forty days. Dr. Dunham, another expert for the plaintiffs, testified, in answer to a hypothetical question which included the assumption that the defendant had dumped waste from the slaughtered cattle which were infected with Bang's disease into the river, that it was a possibility, and a very good possibility, that the Bang's disease was carried through the stream and consumed by Hoag's cattle.

The question, however, which the court was called upon to decide was not what might have caused the infection of Hoag's cattle, but whether the pollution of the river did cause it. No expert expressed any opinion that the infection was caused by the pollution of the river. The defendant's testimony negatived any such theory. It was shown that the intestinal tracts of the cattle which were slaughtered, which tracts might carry the germs of the disease, were preserved and cooked in the plant and a by-product made from them. It was also shown that cattle afflicted with Bang's disease on farms upstream from Hoag's farm had access to the river and might have deposited bacteria in it. In addition, there was expert testimony on behalf of the defendant that there was nothing to indicate that Bang's disease is a water-borne disease; that there is a possibility that it is, but not a probability; and that there was no authenticated case where an outbreak of Bang's disease had been definitely attributed to water supply.

The District Court was justified in determining that the plaintiffs had failed to prove any adequate causal connection between the pollution of the river and the losses suffered by Mr. Hoag from the infection of his cattle with Bang's disease.

### Claims for Loss of Turkeys.

The court denied recovery for the loss of turkeys which was attributed by certain plaintiffs to pollution of the river. The contention that the court erred in this regard is based largely upon expert testimony to the effect "that any decomposing food would be dangerous to young chickens or young turkeys and might well result in their death." In addition there was evidence which indicated that there were only normal losses among turkeys which were fenced away from the river, while there were abnormal losses among those which were not fenced away from it.

It is to be noted that, here again, there is a lack of any definite proof, expert or otherwise, that the turkeys which died, died because they ate anything which was placed in the river by the defendant. The evidence of the defendant indicated that turkeys are difficult to raise, and that farmers along the river above the plant had suffered similar losses. The evidence did not compel the court below to find that the loss of turkeys was proximately caused by the pollution of the river.

### Claims for Reduction in Calf Crop.

The court declined to make any allowance to Edgar I. Olson and his wife for a claimed reduction in calf crop. The contention is that the evidence required such an allowance. Mr. Olson, a graduate of the State Agricultural College, a former County Agent, and an experienced and successful stock raiser who owns a 260-acre farm bordering the river downstream from the packing plant and also another farm nearby which is not on the river, testified that: "We generally expect a ninety per cent calf crop, that is, from every breeding animal we expect one calf every year in ninety per cent of the cases. I think it is generally accepted that cattle in poor condition are not as sure or regular breeders as cows that are in good flesh. Naturally, our cattle, due to the quality of the water and the presence of flies, were not in such condition that they would produce a normal calf crop. As a result we got only about a seventy-five per cent crop." On cross-examination this plaintiff testified that he had changed bulls on his river farm in 1936.

The District Court was not bound to accept the observation or opinion of Mr. Olson as to the cause of the reduction of his calf crop. "Expert opinions are controlling only in so far as found to be reasonable, and their weight is for the trier of the facts to determine. No rule of law compels him to give a controlling influence to opinions of experts or to surrender his own judgment." United States v. Washington Dehydrated Food Co., 8 Cir., 89 F. 2d 606, 609. There is evidence in the record that Mr. Olson's cattle were watered from a well. There is also evidence which would have justified the court in conclud-

ing that flies along the river above the plant were almost as annoying to farmers and their cattle as flies were below the plant; and we think it cannot be said that the evidence compelled a finding that the pollution of the river caused the reduction of the calf crop of which Mr. Olson complains. We cannot say that the finding of the court in this respect was "clearly erroneous".

### Claims for Loss of Milk and Beef Profits.

The court made no allowance for damages to feeder stock. It made an allowance to Edgar I. Olson for decrease in butter fat. It made no allowance on that account to other plaintiffs claiming similar damages.[5]

■ The plaintiffs contend that the evidence required that an allowance be made to all of the plaintiffs who are alleged to have suffered such claimed damages to feeders and milkers. There was evidence that foul water and flies are detrimental to stock, whether milk or beef cattle, and that for the best results in cattle raising a supply of good water is essential. Edgar I. Olson expressed the opinion that the average milk loss per ordinary grade cow, because of the river conditions due to the pollution, would be from $15 to $25 per year, and that the loss of beef stock would be $9 per head per year. As we have already pointed out, the court which tried this case was not compelled to accept Mr. Olson's estimate in this regard. It seems to us—as it seemed to the trial court—that, in order to invoke an allowance of damages for losses due to the failure of cattle to produce

the normal amount of milk or the normal amount of beef, proof should have been offered which would have enabled the court to find, with some reasonable degree of accuracy, what amount of milk or what amount of beef would have been normally produced on each of the farms where cattle were kept, what amount was in fact produced, and what loss in profits resulted.

■ Ordinarily, anticipated profits are dependent upon so many uncertain contingencies that they are not susceptible of that clear and direct proof which the law requires (United States v. Behan, 110 U.S. 338, 344, 4 S.Ct. 81, 28 L.Ed. 168; White River Levee District v. McWilliams Dredging Co., 8 Cir., 40 F.2d 873, 876), although where the evidence shows the extent of such losses as a matter of just and reasonable inference, they may be recovered. Manhattan Oil Co. v. Mosby, 8 Cir., 72 F. 2d 840, 846, 847.

In Holden v. Great Lakes Pipe Line Co., 139 Kan. 71, 29 P.2d 1076, damages for loss of anticipated profits from the sale of milk were allowed where the evidence disclosed the number of cows milked, the average milking period of the cows, the average quantity of milk produced prior to the pollution of the water consumed by the cows, the quantity of milk produced after the pollution, the total sales of milk and cream after the pollution, and the rate of profit on such sales. In Indian Territory Illuminating Oil Co. v. Townley, 10 Cir., 81 F.2d 159, such damages were allowed where the evidence disclosed the size of the herd, the de-

---

[5] With respect to the disallowance of such claims, the court said:

"Damage to feeders is disallowed for the reason that from the record there is no satisfactory basis from which the Court could reasonably estimate damages other than from pure speculation. With reference to the case of Edgar I. Olson the record is silent as to the weight of any feeder when taken to the river farm, how long it remained there, what the weight was when sold or removed; how such weight compared with like feeders on the Hannaford farm of the same age, grade or kind.

＊ ＊ ＊

"Damage to milkers. With reference to the case of Edgar I. Olson it appears that two similar milking herds, one on a farm at Hannaford, North Dakota, and one on the Sheyenne, the milkers were the same grade, all conditions as to feed and care being substantially equal, except drinking water, for the cows; that

accurate records were kept as to the amount of butter fat obtained per cow per year during the years for which damages are claimed on both farms, from which said records it appeared that the cows on the farm in question, forced to drink the river water, yielded a substantially less percentage of butter fat each year than on the Hannaford farm. The Court finds that such testimony and records are sufficiently specific to afford a basis for the allowance of damages in accordance with the proof.

"As to similar claims by other plaintiffs, whose claims have been denied, there is an absence of evidence as to similarity of conditions; also to the age, grade and other condition of milk cows, the amount of butter fat actually produced in such various herds or per cow; the amount of butter fat produced by equal grades and ages of milking cows on other places under like conditions except the water."

crease in milk, the price of milk sold, and the rate of profit. See also, Texas & P. R. Co. v. Mercer, 127 Tex. 220, 90 S.W.2d 557, 106 A.L.R. 1299.

In this case, Edgar I. Olson proved his loss of anticipated profits from milk production by the following testimony: "I have the same kind of stock on this farm as on my farm in Hannaford. Comparing the milk production from the milkers on the farm located on the Sheyenne River with the production of the milkers on the Hannaford farm, feed conditions being equal the production on the Hannaford farm is about twenty-five per cent greater, and as a matter of fact feed conditions were better on this farm than on Hannaford farm. We have kept records on our cows both on the Hannaford farm and on this farm out here. For the last thirteen or fourteen years our average production on the Hannaford farm has been in the neighborhood of three hundred pounds of butter fat annually; the production of the Harwood farm about two hundred pounds. With the average price of butter fat in the neighborhood of about twenty-five cents a pound it would make a difference of about twenty-five dollars annually in the revenue per head. In case of a good grade milker under the same circumstances the decline in milk production would be approximately the same, although the capacity of the average grade cow to produce butter fat is not as high as that of the good pure bred. In my opinion the loss in production of butter fat on a good grade cow per year would be from fifteen to twenty-five dollars." Olson had 14 cows, and was allowed a recovery of $21 a year per cow. No question as to the propriety of this allowance is raised. There was, however, no proof in the record that other plaintiffs who were milk producers had the kind of cows about which Mr. Olson testified, that their cows were of good grade, or that conditions as to their feed and care were similar. Therefore, a factual basis for the application of Mr. Olson's opinion to the claims of other plaintiffs for damages on account of losses of anticipated profits in the sale of milk was not present.

In support of their claimed right to damages for loss of anticipated profits on "feeder" stock, reliance is placed by the plaintiffs upon our opinion in Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840. The record in that case shows that the stream running through the plaintiff's pasture was polluted by the defendant; that the plaintiff's cattle drank the water reluctantly; that they did not fatten; that in order to fatten cattle, plenty of wholesome water is needed; that the average weight of cattle when placed in the pasture in question was 1050 pounds per head; that in the opinion of experts they should have gained 3 to 3½ pounds per head per day over a period of 120 days if the water supply was good, in view of the abundance of feed; that the failure of the cattle to fatten was due to the polluted water; that when the cattle were marketed the average weight was 1187 pounds; and that the market price was a certain amount. The measure of damages applied was the difference in the market value of the cattle when sold and the market value of the cattle as it would have been at that time had they fattened normally. The defendant in that case contended that the loss claimed was too speculative, remote and uncertain to form a basis for recovery. This Court said (pages 846, 847 of 72 F.2d): "If the plaintiff's evidence is to be believed, there was nothing particularly speculative or uncertain about his loss of profits. He had the cattle; he had the grass for them to eat and the water for them to drink; if they had gained, as his evidence showed that they would have gained had his stream not been polluted by the defendants, the cattle would have sold for a certain market price, whereas, because of the pollution of his stream, they were prevented from making a normal gain, and therefore brought a much lower price."

In the case at bar there was no evidence as to when the cattle were sold or that they were sold, or as to what their weight was when feeding commenced or what their normal weight would have been at the time of sale it the nuisance complained of had not existed. This case in this respect is more nearly analogous to that of Deep Rock Oil Corporation v. Griffeth, 177 Okl. 208, 58 P.2d 323. There the plaintiff sought to recover damages caused by the pollution of the water which his cattle drank. His testimony was as follows (pages 324, 325 of 58 P.2d):

"Q. In addition to procuring other pasture and removing your cattle to it, I will ask you if you observed any difference in the condition of the 42 head of cattle which you were pasturing in that pasture along about that time? (Objection by counsel for defendant.) A. They didn't do well.

"Q. Be a little more specific in what you observed in the condition of the cattle as to their appearance, etc.? A. When cattle don't do well, their hair don't look good and they don't put on weight. Changing them from one pasture to another.

"Q. Are you able to tell the jury the difference in dollars between the value of those cattle caused by this change of pasture, or taking them off and by reason of having trouble with the water of the creek? (Objection by counsel for defendant.) A. I can give you my judgment.

"Q. That is what I am asking you for, per head? A. I would say $10.00 apiece.

"Q. And there was 42 head? A. Yes, sir."

The court in that case held that the evidence was insufficient to justify a recovery, because there was no proof of the fair market value of the cattle which were injured by the pollution of the water, either prior to or subsequent to the time of the injury.

It cannot be said that the court below erred in making no allowance for the loss of anticipated profits from feeding cattle.

### Claims for Washing Milk Cows.

The court below made an allowance to some of the plaintiffs for washing milk cows, at the rate of fifteen cents per hour. They had asked for sixty to seventy cents per hour. The contention is that the undisputed evidence was that the time spent in washing cows was worth the higher figure. There was testimony by one of the plaintiffs that "a reasonable wage paid a common laborer on this basis would be sixty to sixty-five cents an hour." Another plaintiff testified: "People say laborers are getting sixty to seventy cents an hour. I don't hire anybody. I have a brother-in-law working in town getting sixty or seventy cents an hour." There was also evidence that one of the plaintiffs had hired his son to operate his farm at a monthly wage of $25 plus board and room. There was no evidence that any of the plaintiffs actually hired anyone to wash cows or paid out any money on that account, nor was there evidence that some washing of cows might not have been necessary if there had been no unlawful pollution of the river. The defendant introduced evidence tending to show that farmers occupying farms on the river above the plant washed milk cows after they had been standing in the river. What constituted, under the circumstances, a reasonable allowance for such washing of cows as was due to the unlawful pollution of the river by the defendant was, under the evidence, a question of fact for the trial court, and we cannot say that its conclusion in that regard was due to any misinterpretation of the evidence or misapplication of the law.

### Claim for Maintaining Fence.

The plaintiff Mrs. Charles Nystrum complains of the action of the court in failing to allow her $16 per year for maintaining a fence to keep the cattle upon her 10½-acre farm away from the river. She testified that: "The water in the river is so sour the cattle can't drink it. It smells awful. We fenced the cattle out of the river. We don't want them to drink the dirty water. It costs fifteen to sixteen dollars a year to maintain the fence and keep it up." The record shows that Mrs. Nystrum had lived upon this farm for 40 years, and during the period for which damages are sought was living there with her son, his wife and their children. Mrs. Nystrum received an allowance from the court of $494 for her damages for the two-year period. The court made no explanation as to the disallowance of her claim for maintaining a fence. The defendant contends that there is no showing that the total amount allowed her was inadequate, and no showing that she herself paid for the fence or its maintenance. We think her testimony that "it costs fifteen to sixteen dollars a year to maintain the fence and keep it up," was not sufficient to compel the court to find that the reasonable cost of maintaining this fence was sixteen dollars a year and that she was out of pocket to that extent in each of the years in question.

### Claims for Interference with Living Comfort.

It is contended that the court's allowance of $150 per year to each of the plaintiffs who occupied their farms, on account of interference with comfortable living due to the pollution of the river, was grossly inadequate and not sustained by any evidence. It would be impossible to ascertain with any degree of accuracy what amount of money would constitute reasonable compensation for the discomfort caused by the foul odors emanating from the river or from the presence of an abnormal number of flies. The responsibility and dis-

cretion for determining fair compensation, under the circumstances, was that of the trial court. See Olson v. Armour & Co., 68 N.D. 272, 280 N.W. 200, 203. We cannot say that as a matter of law the evidence compelled a greater allowance for this item.

Claims for Loss of Riparian Privileges.

■ The allowance by the court of $25 annually for the deprivation of swimming, boating and fishing privileges, which it is contended was grossly inadequate, stands in the same situation. The river below the plant is approximately 15 feet wide and 1½ feet deep. Its banks are muddy. There is testimony that the bottom was firm and hard prior to the existence of the nuisance. The deprivation of these privileges did not result in any actual loss of money. What would constitute reasonable compensation for the loss of these privileges was essentially a question for the trier of the facts.

■ The court allowed $20 annually for the loss of the privilege of taking ice from the river. Many of the plaintiffs filed claims for this item on the theory that they had lost $130 a year by virtue of their inability to use river ice. These claims were based largely upon the testimony of one of the plaintiffs, Roy T. Landblom, whose testimony was to the effect that prior to the operation of the Armour plant he was accustomed to take 40 tons of ice a year from the river; that it cost him twenty-five cents a ton to put up this ice, and that ice from the Red River at Fargo cost him $3.50 a ton. No other plaintiff made any adequate showing that he had used ice from the river or would have used ice from the river except for the pollution, or that he had any equipment for taking ice or any place to store ice, or that the river in front of his place was sufficiently deep or wide to enable him to take 40 tons of ice if he had been able to harvest it and store it. The testimony of some of the plaintiffs negatives any idea that they had any means whatever for storing ice. Moreover, there was no showing that the ice in the river, in the absence of unlawful pollution by the defendant and in the presence of a lawful use of it, would have furnished suitable ice. The court was not required to accept the testimony that 40 tons of ice from the river in front of each of the plaintiff's farms could be harvested for twenty-five cents a ton. We think it was justified in allowing what it regarded as a fair and reasonable

compensation for the deprivation of the privilege of taking ice, classifying that privilege as being in the nature of the other riparian privileges, such as swimming, boating, etc. We are not disposed to disturb the court's conclusion in this regard.

Claims for Diminution of Rental
and Use Value.

Some of the plaintiffs who rented or held for rent their riparian lands complain of the damages allowed them by the court below, claiming that the evidence required greater allowances.

■ Henry L. Hanson, a plaintiff, testified that he owned a 30-acre improved farm worth $3,000 with half a mile of shore line; that the buildings and garden were rented for $4 a month; that "if the river conditions were right" he "could reasonably get as rent * * * about twenty dollars a month for the whole farm." The court allowed him $6 a month as damages. His evidence failed to show the reasonable rental value of the entire farm for the years in question. It showed only that he had actually rented a portion of it for $4 a month. Whether that rental represented the fair rental value of that portion of his farm was left to conjecture. Moreover the court below was not bound by the opinion evidence as to rental value, but was free to exercise its own judgment. The Conqueror, 166 U.S. 110, 130, 131, 17 S.Ct. 510, 41 L.Ed. 937; Forsyth v. Doolittle, 120 U.S. 73, 77, 7 S.Ct. 408, 30 L.Ed. 586; Gloyd v. Commissioner, 8 Cir., 63 F.2d 649, 650-652; Emerald Oil Co. v. Commissioner, 10 Cir., 72 F.2d 681, 683; Bryant v. Commissioner, 2 Cir., 76 F.2d 103, 105; Baltimore & O. R. Co. v. Commissioner, 4 Cir., 78 F.2d 460, 464, 465; Readinger v. Rorick, 6 Cir., 92 F.2d 140, 144.

■ Carl Ingebretson, a plaintiff, testified that he owned a 100-acre farm with about a mile and a half of frontage on the river; that its present value was $10,000; that during 1936 and 1937 the reasonable rental value was $6 an acre; that he rented the farm for $3 cash rental per acre and that one of his tenants left because of the smell and river conditions. The court allowed $1 an acre a year as damages. The evidence failed to show what the reasonable rental value of the farm was during 1936 and 1937. It merely showed what rent this plaintiff received. It did not even show that that was the best rent obtainable.

From this evidence, we think that the court was not compelled to accept the figure of $6 an acre as being the reasonable rental value of the farm in the absence of the nuisance, or the figure of $3 an acre as being the reasonable rental value during the years in question.

■ Ed. Ornberg, administrator of the estate of Peter Ornberg, also a plaintiff, testified that the estate owned a 10-acre farm on the Sheyenne River below the packing plant; that the buildings, consisting of a house, barn, garage, granary and chicken coop, were worth about $2,000; that the farm had no well; that the average annual rental received since 1933 was $100 a year, and that the reasonable rental value of the whole farm, during the years 1934 to 1937, was about $300 a year. The court rejected the testimony, and said that there was "no showing that it (the farm) is worth more than $100 a year." The witness laid virtually no foundation and gave no reason for the opinion which he expressed. While his opinion was admissible, the court below was not bound to accept it. Ensign-Bickford Co. v. Reeves, 8 Cir., 95 F.2d 190, 195. The credibility of this witness and the weight of his evidence, in the light of his self-interest and apparent lack of qualifications, was for the court below to determine.

■ Herman Quan, a plaintiff, testified that he was the owner of a 22.22-acre farm on the Sheyenne River below the packing plant; that the farm was improved with a house, barn, garage and chicken house and was of the value of $2,000 with a normal rental value of $6 or $7 an acre; that during 1936 and 1937 it was held for rent, but was not rented. The court allowed him damages of $100 a year. Computed at $6.00 an acre, the claim for damages would be approximately $132 a year. In contending that his allowance should have been greater, this plaintiff fails to take into consideration that the property no doubt had some rental value during the years in question, even though it was unrented. The plaintiff failed to establish a proper basis for the determination of his damages, and his evidence fails to disclose a sufficient reason for overturning the determination made by the trial court.

■ E. A. Engebretson, a real estate agent, submitted a claim on behalf of the owners of a 520-acre farm on the Sheyenne River affected by the pollution. The farm was valued at eight or nine thousand dollars. It was improved with a house, a good granary, a barn, a chicken coop and a hog house. The claim was for the diminution of rental value computed on the basis of the difference between one-third and one-fourth of the annual crop plus $5 an acre cash rental for 40 acres of the land. The court allowed the diminution in crop rental, but made no allowance for diminution in cash rental. This is claimed to be error. The testimony upon which the claim for a diminution in cash rental was based is as follows:

"In this district very few farms are leased on a cash rental basis, especially farms of average or more than average size. Cash rentals usually apply to small tracts, small truck farms or something of that kind. The usual rental arrangement is a share of the crop and a specified cash rental for a certain acreage devoted to hay pasture and possibly corn. With a farm of this kind used for ordinary farm purposes with a tenant furnishing the seed the usual share for the owner is one-third of the crop and the accompanying cash rental. Sometimes there is an additional cash rental ranging from two to five per cent of the value of the buildings."

"In this locality I would say that on a well improved farm in that district the minimum rental would not be less than two and one-half to three dollars an acre for any good pasture."

"During the years 1932 and on I made every effort to rent this property on a one-third basis. I was never able to secure a tenant on that basis but was compelled to rent on a one-fourth basis. The cash rentals were reduced in the same proportion and in this case a little lower than that. In addition to the reduction we were throwing in the forty acres where the buildings are located free of rental during the years 1932, 1933, 1934, 1935, 1936, without any share of the crop or any cash rental. We threw these forty acres in without anything. The rental value of these forty acres not including any rental value of the buildings is about two hundred dollars a year. This rental value excludes any estimate of the rental value of the buildings."

The fact that the owners of this farm were "throwing in" the 40 acres rent-free did not establish that the 40 acres had no rental value, and did not supply the court with the necessary basis for determining what, if any, allowance should be made because of the diminution in rental for the

40 acres. Under the circumstances, it cannot be said that the court clearly erred in connection with this allowance.

█ Frithjof Selberg, a plaintiff, testified that he owned a 220-acre farm 2½ miles below the plant; that it was equipped with two houses, a barn, a granary, a chicken coop and a well; that he farmed the place himself with the help of his son hired at a salary of $25 a month with room and board; that the son lived on this farm during the years 1936 and 1937, and that Selberg himself lived on another farm a short distance away; that the river farm was procured for the purpose of raising stock; that the "reasonable rental value of the farm for the purpose I intended to use it for would be about five dollars an acre"; and that "with the present condition of the river I would say that the rental value was cut in half." The court below at first allowed the witness no damages, saying: "No damages proven because he worked the land himself through hired men at so much a month and he is not entitled to collect for discomfort of his son." Later the court allowed him $50 a year for pumping water for stock and $4.50 a year for washing cattle. Selberg's claim was for damages of $2.50 an acre on the basis of the diminution in the rental value of the farm. This particular farm was neither rented nor held for rent. That it was adversely affected by the pollution of the river is unquestioned. Diminution in rental value constituted a proper criterion for determining the diminution of the use value of this farm during the years in question. City of Madisonville v. Nisbit, 239 Ky. 366, 39 S.W.2d 690, 691. We think that the court erred in failing to allow this plaintiff a recovery based upon the measure of damages which he selected. We find nothing in the decisions of the Supreme Court of North Dakota which indicates that this measure of damages, under such circumstances, is not available.

### Claims for Exemplary Damages.

█ The plaintiffs contend that the court was in error in failing to award them exemplary damages.

Section 7145, Compiled Laws of North Dakota for 1913, provides: "In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury in addition to the actual damages may give damages for the sake of example and by way of punishing the defendant."

The Supreme Court of North Dakota has declared that exemplary damages may be recovered in an action for breach of an obligation not arising from contract, where a defendant has been guilty of oppression (Stringer v. Elsaas, 37 N.D. 20, 163 N.W. 558, 559; Wuest v. Richmond, 48 N.D. 1081, 188 N.W. 573, 574), fraud or malice (Lindblom v. Sonstelie, 10 N.D. 140, 86 N.W. 357, 358, 359; Powell v. Meiers, 54 N.D. 336, 209 N.W. 547, 549; Lyons v. Thomas, 63 S.D. 334, 258 N.W. 133, 134), in the discretion of the trier of facts (Shoemaker v. Sonju, 15 N.D. 518, 108 N.W. 42, 44, 11 Ann.Cas. 1173.) It seems obvious that the court below was not compelled to allow exemplary damages. Whether it might have done so, we need not decide. No error can be predicated upon the failure of the court to allow exemplary damages.

### Claims for Interest.

█ The plaintiffs contend that the lower court should have awarded them interest upon their judgments.

Section 7143, Compiled Laws of North Dakota for 1913, provides as follows: "In an action for the breach of an obligation not arising from contract and in every case of oppression, fraud or malice interest may be given in the discretion of the jury." Under this statute and the decisions of the Supreme Court of North Dakota, the allowance of interest in such a case as this is discretionary with the trier of the facts and not obligatory, and interest may not be awarded as a matter of law. Ell v. Northern Pacific R. Co., 1 N.D. 336, 353, 48 N.W. 222, 12 L.R.A. 97, 26 Am.St.Rep. 621; Johnson v. Northern Pacific R. Co., 1 N.D. 354, 364, 48 N.W. 227; Seckerson v. Sinclair, 24 N.D. 625, 639, 140 N.W. 239, 246; Burke v. Minnekota Elevator Co., 48 N.D. 795, 186 N.W. 948, 950.

### Claims for Attorneys' Fees.

█ The plaintiffs contend that the trial court should have allowed them, as a part of their costs or damages, attorneys' fees. This because their counsel will not otherwise be adequately compensated. Whether the court could, in its discretion, have allowed attorneys' fees, it is not necessary to consider. This is not the type of case in which attorneys' fees are ordinarily taxed as costs or added to the judgments recovered. Gold Dust Corporation v. Hoffenberg, 2 Cir., 87 F.2d 451, 453; Guardian

Trust Co. v. Kansas City So. R. Co., 8 Cir., 28 F.2d 233, 244.

#### Denial of Petition for Rehearing.

 As has already been pointed out, after the District Court had filed its opinion stating the items of damages allowed and the items disallowed and directing counsel for the plaintiffs to prepare findings of fact and declarations of law in accordance with the opinion, the plaintiffs filed a petition for rehearing which, among other things, prayed that the case be reopened with respect to some of the claims of the plaintiffs, for the purpose of enabling them to prove their damages in detail and to the full satisfaction of the court. It is asserted that the court erred in denying this petition, and that justice required that it should be granted. The petition was addressed to the discretion of the court, and its action in denying it is not reviewable here. First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co., 8 Cir., 98 F.2d 416, 428. It is clear, however, that the court below was not guilty of any abuse of discretion in refusing to reopen the case for the taking of further proofs, upon the showing which was made. There was nothing to indicate that the plaintiffs had not been afforded every opportunity to present their evidence as to their damages in complete detail, and no showing of any excusable neglect on their part or the part of their counsel for their failure to do so.

 The plaintiffs, in appealing, seem to have assumed that this Court, the jurisdiction of which is appellate, would, in effect, retry the issues which were tried in the court below and would substitute its judgment as to damages for that of the trial court. This is a misconception. It is not the function of this Court to retry this case and to pass upon questions of fact the determination of which depended upon the credibility of witnesses and the weight of evidence, or to substitute its judgment for that of the trier of the facts which had reached permissible conclusions. See Helvering v. Johnson, 8 Cir., 104 F.2d 140, 144, and cases cited, and Rule 52(a) of the Rules of Civil Procedure for the District Courts of the United States, 28 U.S.C.A. following section 723c.

The decree is affirmed as to all of the plaintiffs except Frithjof Selberg. As to him the decree is reversed and the case remanded to the lower court with directions to grant him a rehearing and to award him as damages such an amount as will fairly represent the diminution in the reasonable rental or use value of his farm during the years 1936 and 1937 caused by the existence of the nuisance complained of.